**2018 UT App 194**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
BRIAN NEWTON,
Appellant.

Opinion
No. 20170205-CA
Filed October 12, 2018

Third District Court, Salt Lake Department
The Honorable Paul B. Parker
No. 121905738

Ronald J. Yengich, Attorney for Appellant

Sean D. Reyes and Jeanne B. Inouye, Attorneys
for Appellee

JUDGE KATE A. TOOMEY authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and JILL M. POHLMAN
concurred.

TOOMEY, Judge:

¶1 A jury convicted Brian Newton of one count of first-degree aggravated sexual assault and one count of third-degree aggravated assault. After trial, Newton obtained new counsel and filed a motion to arrest judgment and for a new trial (the Motion for New Trial), claiming a jury instruction error, a *Brady*[1] violation related to Victim's cell phone, and four

---

1. *Brady v. Maryland*, 373 U.S. 83, 86–87 (1963) ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates [the Due Process Clause of the Fourteenth Amendment] where the evidence is material either to

(continued…)

instances of ineffective assistance of trial counsel. The district court denied the Motion for New Trial. We agree with the district court that there was no error in the jury instruction, that the State did not commit a *Brady* violation, and that the evidence on Victim's phone was neither material nor exculpatory. Because Newton fails to address the district court's ruling on the remaining ineffective assistance of counsel claims, we decline to address them on appeal. Accordingly, we affirm.

BACKGROUND

¶2 Victim attended a party at a friend's house where she met Newton and his girlfriend.[2] Everyone at the party had been consuming alcohol. Victim spoke with Newton at the party but felt uncomfortable around him, at first, and told him that she thought "he was weird and creepy." But he was "nice after that."

¶3 The party continued through the early morning hours of the following day. At around 3:00 a.m., Newton asked Victim if she wanted to leave and get something to eat. Victim agreed, stating that she "didn't want to fall asleep" because she was waiting for her boyfriend. Newton first drove Victim to a fast food restaurant where Newton ordered food. He then drove Victim to a truck stop and parked in a dark part of the parking lot, away from other vehicles.

(…continued)
guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

2. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (quotation simplified).

¶4     Newton and Victim listened to music for a while, and then he exited the vehicle, opened Victim's door, leaned her seat back, and got on top of her. Victim testified that she did not say anything at first but thought to herself, "What's going on." Newton "[f]orcibly" removed all of Victim's clothing and undergarments while she was "screaming and crying and pushing him." Newton put his hand around her neck and choked her to the point that she felt she was "going to lose consciousness" and then raped her. He first penetrated his penis into her vagina and then attempted to penetrate his penis into her anus but was unsuccessful because she "freaked out even more." Newton then grabbed a gun, held it to her head, and continued to rape her vaginally while she "cr[ied] quietly."

¶5     At one point, Victim said she needed to throw up. After Newton rolled down the window, she attempted to make loud retching noises to get the attention of anyone who might be nearby. She did not try to scream or call for help while the window was rolled down, because she feared that Newton would shoot her. Victim's efforts to summon assistance were unsuccessful. After ejaculating, Newton returned to the driver's side of the vehicle and Victim dressed. Newton drove away from the truck stop and told Victim that "he had to make a phone call to a friend to see if he had to kill [her] or not." When he slowed down at a red light, Victim jumped out and ran barefoot to the nearest neighborhood she could find, leaving her cell phone in the vehicle.

¶6     Victim eventually arrived at a gas station where a man offered to help by giving her a ride. Although Victim did not know the man, Victim felt "scatterbrained" and "needed help," so she accepted his offer, and he drove her to her friend's house. When Victim arrived at the friend's house the police were already there. Victim explained to an officer that Newton raped her and threatened her with a gun. The officer told her to go to the hospital for a sexual assault examination.

¶7     During the examination, the sexual assault nurse examiner (Nurse) swabbed Victim's vagina, mouth, and belly button to collect DNA, which matched Newton's DNA. Nurse also took photographs of Victim's body. One photograph revealed a petechia—redness of the skin caused by pressure, either sucking or pushing—on Victim's trachea, which is an injury "consistent with strangulation." The other photographs included: three injuries on Victim's breasts and one on the front of a shoulder, marked by redness and a petechia; a bruise on the inside of an elbow and one on a forearm; numerous bruises and a petechia on her thighs; bruises on her knees and an ankle; and a blister on her heel "from walking barefoot after the assault."[3] Nurse also examined Victim's genital injuries and noted bruises and an open abrasion in and around her labia. At trial, Nurse testified that there was also a "little chunk of skin" missing in a location where "[a]nybody who had [sustained] an injury like that consensually would be [the result of] an accident and . . . [i]ntercourse would be stopped by the woman because it would be very painful." Nurse also testified that the injuries could be "consistent with non-consensual intercourse," but she also conceded that "regardless of how careful you are, there can be some sort of injuries sometimes during consensual intercourse."

¶8     Newton testified in his defense at trial. He said that, at the party, Victim "asked [him] if [he] wanted to go get something to eat." He agreed and escorted her to his car where he "checked for [his] concealed carry [gun] because [he] wouldn't want it to be missing and be used in a possible crime." Newton kept his gun in a safe under his seat that requires a "four to six entry combination" to open. He then drove Victim to a fast food restaurant. After picking up his order, they returned to his car and he started to drive away. He testified that when he "reached

---

3. During the examination, Victim stated that one of the bruises on her right thigh existed before the assault.

back to put [his] hand on [her] headrest," she put her hand on his leg and "proceeded to move her hand up . . . [and] started to undo [his] pants." Newton decided to pull over into a parking lot. Victim began to stroke his penis and then they started to kiss. According to Newton, Victim "climbed over on top of [him] in the driver's seat" and they removed their clothes.

¶9 According to Newton, while engaging in sexual intercourse, Victim bumped the horn on the steering wheel, and they both agreed to move to the passenger seat. Newton described different sexual positions they used, including being on top of and behind Victim. At one point, Victim said she needed to throw up. Newton rolled down the window and heard some retching noises after which Victim said she felt fine. He testified they both put their clothes back on after having sex and he drove Victim to her house. Newton testified that Victim "passed out" during the drive. When he got to her house, he left Victim sitting on a wooden bench on the porch. He also testified that he never removed the gun from the safe and the only time Victim could have seen it was when he "opened the safe to check" that it was still there.

¶10 The jury convicted Newton of one count of first-degree aggravated sexual assault and one count of third-degree aggravated assault. He was acquitted of a second count of first-degree aggravated sexual assault and one count of first-degree aggravated kidnapping.

¶11 Following the convictions, Newton hired new counsel who filed the Motion for New Trial. Newton argued that his original trial counsel rendered ineffective assistance by failing to object to the jury instruction defining rape.[4] He also argued that

---

4. Newton raised numerous other ineffective assistance of counsel claims in the Motion for New Trial, but as we discuss in

(continued…)

the State committed a *Brady* violation when it did not conduct a forensic examination of Victim's cell phone.

¶12    The court first addressed the jury instruction claim. The jury was instructed that to convict Newton of aggravated sexual assault, the jury was required to find:

> 1. The defendant, BRIAN NEWTON,
>
> 2. In the course of committing rape,
>
> 3. Did any one of the following:
>
>> a. Used, or threated [Victim] with the use of, a dangerous weapon, or
>>
>> b. Compelled, or attempted to compel, [Victim] to submit to rape, by threat of kidnapping, death, or serious bodily injury to be inflicted imminently on any person; and
>
> 4. The defendant acted intentionally, knowingly, or recklessly.

---

(…continued)

greater detail below, *see infra* ¶¶ 19–20 & n.8, we are precluded from reaching those arguments and therefore do not articulate the factual circumstances relevant to them. We note, however, that any remedy Newton might have for his argument that he did not receive a fair trial because he was not represented by the specific attorney his father hired on his behalf does not lie with this court. Especially considering the district court's conclusions that the attorney who represented Newton at trial was not constitutionally ineffective on any claim Newton raised and the court did not find credible the testimony of Newton's father.

The next instruction read: "'Rape' as defined in the law means the actor knowingly, intentionally, or recklessly has sexual intercourse with another without that person's consent."

¶13    Newton argued that *State v. Barela*, 2015 UT 22, 349 P.3d 676, "compel[led the] court to find [his] trial counsel ineffective for failing to object to the jury instruction given on the elements of the crime of Rape because [it] did not clearly establish the requirement of mens rea as to [Victim's] non consent." But the court disagreed, distinguishing the rape instruction in *Barela* from the instruction given at Newton's trial. It explained that, because the instruction was one sentence long and the terms "knowingly, intentionally or recklessly . . . immediately precede[d] words describing the prohibited conduct, sexual intercourse with another person without that person's consent," "[t]here [was] no room for the jury to imply a difference between the act of intercourse and the non-consent of [Victim]." Accordingly, the court concluded that trial counsel was not constitutionally ineffective for failing to object to the instruction and that the district court did not commit plain error when it gave the rape instruction to the jury.

¶14    The court also considered Newton's *Brady* claim. In support of his argument that the State committed a *Brady* violation, Newton directed the court to his pretrial motion for access to Victim's cell phone "for the purpose of a forensic examination," asserting that the cell phone "may have exculpatory evidence contained within it" and may undermine the jury's verdict. The State opposed the motion, arguing that "the State is not aware of evidence contained on the phone that 'tends to negate the guilt of the accused, mitigate the guilt of the defendant, or mitigate the degree of the offense for reduced punishment.'" (Quoting Utah R. Crim. P. 16(a)(4).) The State further noted that Newton did not show "good cause" to authorize the search of Victim's cell phone because the motion was based on Newton's "naked belief that the phone 'may have

exculpatory evidence contained within it.'" (Quoting Utah R. Crim. P. 16(a)(5).) The police did not conduct a forensic examination of Victim's cell phone, but the State provided trial counsel with the "call and text records" obtained from it. Following the Motion for New Trial, the court determined that the content of the phone and its condition when found were relevant to Newton's post-trial claims and ordered a "full forensic examination of the cell phone."

¶15 The forensic analysis revealed that Victim entered Newton's name and cell phone number into her phone at around 3:09 a.m., shortly after they left the party and prior to the rape.[5] It also revealed a "series of phone calls and text messages that were received" during the period between their departure from the party and the rape. Following an evidentiary hearing, the court determined that the cell phone evidence was neither material nor exculpatory, because the jury could have interpreted it to mean that Victim had "no bias" against Newton prior to the rape, and because the "information found on the phone also corroborated the testimony that friends were trying to reach [Victim] for hours without success." The court concluded that the "evidence found on [Victim's] phone post-trial was unlikely to have affected the verdict" given that "the evidence against [Newton] was substantial" and that the forensic examination of the cell phone corroborated Victim's testimony.

¶16 The court therefore denied the Motion for New Trial. Newton appeals.

---

5. A surveillance video of the fast food restaurant showed that Newton and Victim entered the restaurant around 3:00 a.m., that Victim was seen using her cell phone, and that Victim and Newton left together at around 3:09 a.m.

ISSUES AND STANDARDS OF REVIEW

¶17  Newton contends the "jury was improperly instructed regarding the mens rea element of rape" and asks this court to review this issue for plain error, manifest injustice, and ineffective assistance of counsel. Newton raised this issue before the district court in the Motion for New Trial, based on the ineffective assistance of counsel. We therefore review Newton's argument only to the extent he challenges the district court's ruling. [6] *See Allen v. Friel*, 2008 UT 56, ¶ 4, 194 P.3d 903 (affirming the district court's decision because the defendant "ignored one of the most fundamental principles of the appellate process when he did not identify any flaws in the district court's order that required reversal"); *cf. Ellis v. State*, 2014 UT App 50, ¶ 5, 321 P.3d 1174 (per curiam) ("Because an appellate court reviews the decision of a [district] court, an appellant must address the rationale of the [district] court's rulings and identify why the ruling should be overturned."). When the district court "has previously held an evidentiary hearing on a motion based on ineffective assistance of counsel, such a claim presents a mixed question of law and fact." *State v. Burnside*, 2016 UT App 224, ¶ 18, 387 P.3d 570 (quotation simplified). We therefore "review the district court's factual findings for clear error and its legal conclusions for correctness." *Id.*

---

6. To the extent Newton argues that we should review this issue under the rubrics of plain error and manifest injustice, those arguments fail. "[I]n most circumstances manifest injustice is synonymous with plain error," and to succeed on a claim of plain error, Newton "must establish harmful error that should have been obvious to the [district] court." *State v. Reigelsperger*, 2017 UT App 101, ¶ 39, 400 P.3d 1127. Because we conclude that there was no error in the rape jury instruction, *see infra* ¶ 29, Newton cannot prevail under the rubric of plain error.

¶18    Newton also contends the State "failed to pursue and disclose material evidence from [Victim's] cell phone," which he argues amounted to a *Brady* violation. Because this issue was raised before the district court, we review the district court's "factual findings for clear error and its legal conclusions for correctness." *Id.* Relatedly, Newton contends the district court erroneously determined the evidence located on Victim's cell phone was not material and exculpatory and therefore erred in denying the Motion for New Trial on that basis.[7] When the district court denies a motion to arrest judgment and for a new trial, we review that decision for an abuse of discretion, but "we review the legal standards applied by the [district] court in denying such a motion for correctness." *State v. Montoya*, 2017 UT App 110, ¶ 11, 400 P.3d 1193 (quotation simplified).

¶19    Finally, Newton contends his trial counsel was ineffective for failing to (1) "object to inadmissible prejudicial testimony," (2) "investigate," and (3) "adequately prepare for trial." Newton raised these claims of ineffective assistance of counsel before the district court. The court held evidentiary hearings on these allegations and issued an order denying Newton's motion, supported with findings of fact and conclusions of law.

¶20    On appeal, Newton makes the same three arguments, without challenging the court's findings of fact or conclusions of law. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to

---

7. Newton also argues that the "cumulative errors require a new trial." "Under the cumulative error doctrine, we will reverse only if the cumulative effect of the several errors undermines our confidence that a fair trial was had." *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993) (quotation simplified). Because we conclude that no error occurred, *see infra* ¶¶ 29, 34, 37, the cumulative error doctrine does not apply.

review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Craft*, 2017 UT App 87, ¶ 15, 397 P.3d 889 (quotation simplified). But Newton does not raise these issues for the first time on appeal. Instead, he asserts the same arguments that the district court ruled on. The issues before us are therefore mixed questions of law and fact, and "we review the district court's factual findings for clear error and its legal conclusions for correctness." *Burnside*, 2016 UT App 224, ¶ 18 (quotation simplified). To succeed on appeal, Newton necessarily must challenge the district court's factual findings and conclusions of law, and he cannot make the same arguments anew while ignoring the proceedings below that adjudicated the same issues.[8] *See id.* ¶¶ 42–43. Because Newton "has failed to

---

8. A situation in which a defendant argues ineffective assistance of counsel in post-trial motions before the district court is similar to petitions for post-conviction relief based on ineffective assistance of counsel. These motions and petitions are filed with the district court and the district court generally rules on them with supportive findings of fact and conclusions of law. In appeals from the denial of a petition for post-conviction relief, the defendant must challenge the rationale for the district court's ruling to demonstrate error in that ruling. *See Ellis v. State*, 2014 UT App 50, ¶ 5, 321 P.3d 1174 (per curiam). We see no difference in a defendant's burden on appeal when the district court has adjudicated the same claim of ineffective assistance of counsel in a post-trial motion for a new trial. *Compare Archuleta v. Galetka*, 2011 UT 73, ¶ 25, 267 P.3d 232 (explaining that, in the context of post-conviction relief, "when confronted with ineffective assistance of counsel claims, we review a lower court's purely factual findings for clear error, but we review the application of the law to the facts for correctness" (quotation simplified)), *with State v. Burnside*, 2016 UT App 224, ¶ 18, 387 P.3d 570 ("In a situation . . . in which the [district] court has previously held an

(continued…)

address (or even acknowledge) the [district] court's decision on the[se] issue[s]," *see id.* ¶ 42, he cannot meet his burden of persuasion on appeal and we therefore do not further address them, s*ee Ellis*, 2014 UT App 50, ¶ 5.


ANALYSIS

I. The Jury Instruction

¶21 Newton contends the district court erred in determining that trial counsel was not constitutionally ineffective for failing to object to the rape jury instruction and in denying the Motion for New Trial on that basis. He argues that the court erred in determining the rape instruction was correct because the instruction was one sentence that did not separate the mens rea from the acts required to commit rape. The instruction read: "'Rape' as defined in the law means the actor knowingly, intentionally, or recklessly has sexual intercourse with another without that person's consent." He asserts that the instruction did not provide that "knowingly, intentionally, or recklessly" applied to "the element of non-consent" and counsel should therefore have objected to it. We disagree.

¶22 To succeed on a claim of ineffective assistance of counsel, a defendant must demonstrate "(1) that counsel's performance was objectively deficient, and (2) a reasonable probability exists that but for the deficient conduct defendant would have obtained a more favorable outcome at trial." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162; *see also Strickland v. Washington*, 466 U.S.

___

(…continued)
evidentiary hearing on a motion based on ineffective assistance of counsel . . . we review the district court's factual findings for clear error and its legal conclusions for correctness." (quotation simplified)).

668, 687 (1984). When the defendant fails to make a sufficient showing on one of the *Strickland* prongs, we need not address both of them. *See State v. Veale*, 2012 UT App 131, ¶ 5, 278 P.3d 153. Because Newton fails to demonstrate that trial counsel performed deficiently, we do not address the prejudice prong.

¶23 To demonstrate that trial counsel performed deficiently, Newton "must overcome the strong presumption that his trial counsel rendered adequate assistance by persuading the court that there was no conceivable tactical basis for counsel's actions." *Clark*, 2004 UT 25, ¶ 6 (quotation simplified). "It is well settled that counsel's performance at trial is not deficient if counsel refrains from making futile objections, motions, or requests." *State v. Perez-Avila*, 2006 UT App 71, ¶ 7, 131 P.3d 864. Newton therefore must demonstrate that counsel's objection to the rape instruction would not have been futile.

¶24 Here, the district court determined that the jury instruction defining the elements of rape was "not incorrect and therefore [did] not provide a basis for a claim of ineffective assistance of counsel." The court rejected Newton's argument that the jury instruction defining rape was similar to the erroneous instruction in *State v. Barela*, 2015 UT 22, 349 P.3d 676. We likewise conclude that the jury instruction in *Barela* is distinguishable from the instruction given at Newton's trial.

¶25 In *Barela*, the jury was instructed that to find Barela guilty of rape it would have to find:

> 1. The defendant, Robert K. Barela,
>
> 2. Intentionally or knowingly;
>
> 3. Had sexual intercourse with K.M.;
>
> 4. That said act of intercourse was without the consent of K.M.

*Id.* ¶ 13. The *Barela* court held that the "instruction was in error" because it "implied that the mens rea requirement . . . applied *only* to the act of sexual intercourse, and not to [the victim's] nonconsent . . . by coupling the mens rea requirement directly with the element of sexual intercourse, and by articulating the element of [the victim's] nonconsent without any apparent counterpart requirement of mens rea." *Id.* ¶ 26. Further, the erroneous instruction "was reasonably likely to have affected the verdict" because "even in [the victim's] account, she never explicitly (in words) or openly (in physical resistance) rebuffed Barela's advances." *Id.* ¶¶ 28–29. The victim's account of the alleged rape was also inconsistent over time. *See id.* ¶ 11.

¶26    Here, the jury instruction provided: "'Rape' as defined in the law means the actor knowingly, intentionally, or recklessly has sexual intercourse with another without that person's consent." Unlike in *Barela*, the instruction did not separate the mens rea from the act or the element of non-consent. In addition, the Utah Code provides that "[a] person commits rape when the actor has sexual intercourse with another person without the victim's consent." Utah Code Ann. § 76-5-402(1) (LexisNexis 2017). Our legislature has provided that "when the definition of [a criminal] offense does not specify a culpable mental state and the offense does not involve strict liability, intent, knowledge, or recklessness shall suffice to establish criminal responsibility." *Id.* § 76-2-102. The application of the required culpable mental state of "intent, knowledge, or recklessness" to section 76-5-402's definition of rape results in the rape instruction provided to the jury. We are therefore unpersuaded by Newton's argument that, because "the jury was not law-trained," "it [was] unrealistic for counsel, or the court, to assume that the jury would know based on the one sentence instruction, that mens rea was also required for the element of non-consent."

¶27    To further support our conclusion that the jury instruction properly informed the jury of the necessary elements of rape, we

refer to the jury instruction for rape given in *State v. Marchet*, 2009 UT App 262, 219 P.3d 75. In that case, the jury was instructed that it could convict the defendant of rape if it found:

> 1. . . . [the defendant] had sexual intercourse with [the victim]; and
>
> 2. That said act of intercourse was without the consent of [the victim]; and
>
> 3. That the defendant acted intentionally or knowingly or recklessly.

*Id.* ¶ 21. The defendant challenged the instruction, arguing that it "[did] not adequately inform the jury that the State had the burden of proving his mental state with regard to each element of the crime of rape." *Id.* Specifically, he argued that the instruction "did not require the jury to find any mental state on [the defendant's] part with regard to [the victim's] consent or lack thereof." *Id.* (quotation simplified). This court disagreed, explaining that the Utah Code "defines the crime of rape as consisting of two elements: (1) the act of sexual intercourse (2) committed without the other person's consent." *Id.* ¶ 22. It further explained that, under the Utah Code, the defendant could not be convicted of rape unless he acted intentionally, knowingly, or recklessly. *Id.* The rape instruction therefore "accurately identified each element of the crime of rape and correctly stated the applicable mental state" because the jury was instructed that to convict the defendant of rape it "must find beyond a reasonable doubt that he intentionally, knowingly, or recklessly had nonconsensual sexual intercourse with [the victim]." *Id.*

¶28 The jury instruction in Newton's case is more similar to the instruction provided in *Marchet* than to the one provided in *Barela*. In addition, it is even less likely that the jury in Newton's case misinterpreted the elements necessary to find that he raped

Victim than the jury in *Marchet*. Rather than providing the culpable mental state as a catch-all at the end of the instruction, *see id.* ¶ 21, Newton's instruction seamlessly provided that the applicable mens rea applied to both the act of sexual intercourse and Victim's non-consent.

¶29    We agree with the district court that there was no error in the jury instruction and therefore there was "no room for the jury to imply a difference between the act of intercourse and the non-consent of [Victim]." As a result, any objection on trial counsel's part would have been futile and Newton's claim of ineffective assistance of counsel with respect to the jury instruction fails.

## II. The *Brady* Violation

¶30    Newton contends the district court erroneously denied the Motion for New Trial because (1) the State violated its "affirmative duty to *seek out* exculpatory evidence, and turn such evidence over to the defendant," and (2) the court erred in determining that the evidence collected from Victim's cell phone was not material and exculpatory. On his first point, he argues that Victim's cell phone was a critical piece of evidence that was alluded to throughout trial and that the State was "obligate[d]" to review the evidence that it may have contained. On his second point, he asserts that the evidence collected from Victim's cell phone was material and exculpatory because it "directly contradict[ed] [Victim's testimony] and undermine[d] her credibility." We address each argument in turn.

¶31    "[T]he suppression by the prosecution of evidence favorable to an accused upon request [by the defense] violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Further, "regardless of request, favorable evidence is material, and constitutional error results from its suppression by the

government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quotation simplified).

¶32    First, Newton argues the State committed a *Brady* violation when it failed to conduct a forensic examination of Victim's cell phone once it had been turned over to the police. He cites *Kyles* in support of this argument. But his reliance on *Kyles* is misplaced. There, the United States Supreme Court explained that the prosecution has "a degree of discretion" when determining "materiality in terms of the cumulative effect of suppression" of evidence. *Id.* at 437. But this discretion has "a corresponding burden." *Id.* Because the prosecution "alone can know what is undisclosed, [it] must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached." *Id.* "This in turn means that the individual prosecutor has a duty to learn of any favorable evidence *known* to the others acting on the government's behalf in the case, including the police." *Id.* (emphasis added).

¶33    The evidence on Victim's cell phone was unknown to the prosecution or any other person "acting on the government's behalf in [this] case." *See id.* Before trial, the State opposed Newton's motion to discover Victim's cell phone "for the purpose of a forensic examination," arguing that "the State [was] not aware of evidence contained on the phone that 'tends to negate the guilt of the accused, mitigate the guilt of the defendant, or mitigate the degree of the offense for reduced punishment.'" (Quoting Utah R. Crim. P. 16(a)(4).) The State further argued that Newton did not show "good cause" to authorize the search of Victim's cell phone because the motion was based on Newton's "naked belief that the phone may have exculpatory evidence contained within it." *See* Utah R. Crim. P. 16(a)(5). And at a post-trial evidentiary hearing, the prosecutor

testified that he "had no idea of anything that was on the phone," either inculpatory or exculpatory, and that he never directed anyone to "look into what was on the phone."

¶34   The prosecutor therefore did not have knowledge of the forensic evidence of the cell phone, and the record does not reflect that Newton elicited evidence that the prosecutor or any other individual working for the State should have known there was exculpatory evidence on the cell phone. *See Kyles*, 514 U.S. at 437 (explaining that prosecutors have "a duty to learn of any favorable evidence *known* to the others acting on the government's behalf in the case, including the police" (emphasis added)). And none of the cases Newton cites require the prosecution to "seek out" exculpatory information unknown to it or any others acting on its behalf. We therefore reject Newton's argument that, "once the police were in possession of [Victim's] cell phone, . . . the State had a constitutional obligation to seek out any evidence that was on the phone, regardless of whether it thought that the phone would contain anything of value." We conclude that the State did not commit a *Brady* violation when it did not independently conduct a forensic examination of Victim's cell phone.

¶35   Second, Newton argues that the district court erred when it determined that the evidence collected from Victim's cell phone was not material and exculpatory.

¶36   The district court determined that the evidence on Victim's cell phone was relevant to Newton's claim of ineffective assistance of counsel. It therefore granted Newton's post-trial motion to discover Victim's cell phone and ordered a forensic examination to determine whether it contained exculpatory evidence. The examination revealed that Victim entered Newton's name and cell phone number into her phone after leaving the party, but prior to the rape, and that her phone received a series of unanswered phone calls and text messages.

The court concluded this evidence was the information was not material and exculpatory and was "unlikely to have affected the verdict," because it could show only that Victim had "no bias" against Newton prior to the rape, and it corroborated Victim's account that her friends unsuccessfully attempted to contact her during the incident.

¶37    Newton challenges this conclusion. He relies on the assertion that the evidence that Victim entered his phone number into her cell phone just before the rape undermined her credibility because she testified that he was "weird and creepy." But Victim also testified on direct and cross-examination that after telling Newton that she thought he was "weird and creepy," "he was nice after that." In addition, Newton fails to explain how entering his phone number before the rape would have "provided circumstantial evidence of consent." We therefore conclude the district court did not err in denying the Motion for New Trial after determining that the evidence on Victim's cell phone was not material and exculpatory.

CONCLUSION

¶38    We conclude that because the jury instruction defining rape accurately articulated the elements of the crime, any objection to the instruction would have been futile and Newton therefore cannot show ineffective assistance of counsel. We further conclude the State did not commit a *Brady* violation, because it did not have knowledge that the cell phone may have contained exculpatory evidence. Finally, we conclude the district court did not err in determining that the forensic examination of the cell phone did not reveal material and exculpatory evidence. Accordingly, we affirm.

––––––––––