*This opinion is subject to revision before final publication in the Pacific Reporter*

**2020 UT 24**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Respondent,*

*v.*

BRIAN NEWTON,
*Petitioner.*

No. 20180915
Heard December 9, 2019
Filed May 14, 2020

On Certiorari to the Utah Court of Appeals

Third District, Salt Lake
The Honorable Paul B. Parker
No. 121905738

Attorneys:

Sean D. Reyes, Att'y Gen., Christopher D. Ballard, Asst. Solic.
Gen., T. Langdon Fisher, Joseph S. Hill, Salt Lake City,
for respondent

Ronald J. Yengich, Herschel Bullen, Salt Lake City, for petitioner

JUSTICE HIMONAS authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE PEARCE, and JUSTICE PETERSEN joined.

JUSTICE PETERSEN filed a concurring opinion, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE HIMONAS, and JUSTICE PEARCE joined.

JUSTICE HIMONAS, opinion of the Court:

### INTRODUCTION

¶1 Brian Newton had sexual intercourse with M.F., a woman he met at a party some hours earlier. He said that M.F. consented to—and even initiated—the intercourse. M.F., in contrast, said that Newton raped her. In the aftermath, Newton was convicted

of aggravated sexual assault and aggravated assault. He then obtained new counsel, moved for a new trial, and claimed (1) that his trial counsel was ineffective for not having objected to the jury instruction for rape and (2) that the State had violated the disclosure requirements of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), by refusing to conduct a forensic exam of M.F.'s cell phone. The district court denied the motion and the court of appeals affirmed. Because Newton was not prejudiced by any alleged error in the jury instruction,[1] because the State had no duty under *Brady* to conduct a forensic examination on the cell phone before trial, and because the evidence ultimately retrieved from a posttrial forensic examination of the cell phone was not material, we affirm.

## BACKGROUND

¶2 M.F. accused Newton of raping her in his car. He was charged with two counts of aggravated sexual assault, one count of aggravated kidnapping, and one count of aggravated assault. At trial, M.F. and Newton each testified, giving their conflicting accounts of what happened.

*M.F.'s and Newton's Conflicting Accounts*

¶3 M.F. testified at trial that Newton was at a party that she attended on May 29, 2012. M.F. said that she drank alcohol at the party and that she "told [Newton] that [she] hated him" because "he was weird and creepy." She explained at trial that she had felt that way because of "the vib[e]s he gave off but then he was nice after that." Eventually, the two left the party together at around 3:00 a.m. to get a bite to eat. Newton drove her to a Subway, where he bought a sandwich, and then to a parking lot, where the attack occurred.

¶4 M.F. described how it unfolded. Newton got out of the car, walked to the passenger side, and got on top of her, leaning her chair back. Newton then unzipped her dress and "forcibly" removed her underwear and bra. Meanwhile, M.F. was "fighting back," "screaming and crying and pushing him." Newton then

---

[1] Despite not opining on whether counsel was deficient in failing to object to the jury instruction for rape, and for the benefit of the courts and lawyers of this state, we encourage trial courts to use Utah's model jury instruction on rape. *Infra* ¶ 28.

put his hand around M.F.'s throat, choking her to the point that she felt as though she would lose consciousness. At that point, Newton raped M.F. vaginally. When he tried to rape her anally, she "freaked out even more," and he reacted by grabbing a gun from the floor of the driver's side of the car and pointing it at her head, saying that if she was quiet and let him finish, he would take her back to the party. He then flipped her back over and again raped her vaginally.

¶5   M.F. also described how she fled from the car after Newton drove away from the parking lot and slowed down for a red light. In doing so, she said, she left her cell phone in his car. M.F. began walking home. She ended up, however, at a Chevron from which a stranger gave her a ride to her friend's house. Some of her friends were there—having been concerned about what had happened to her and having had called the police. M.F. told them about the attack. A police officer told M.F. that she should go to the hospital, and she did. There, a sexual assault nurse examiner performed a rape exam on M.F.[2]

¶6   Newton told a story at trial very different than that of M.F. He testified that his encounter with M.F. was entirely consensual. He even said that M.F. initiated the encounter as they left the Subway by stroking his penis and then—after Newton parked—climbing on top of him to have intercourse. He also testified that M.F. performed oral sex on him. Afterwards, he said, he dropped her off at a place he thought to be her home. He said that the only time M.F. would have seen a gun was when he got into his vehicle and checked to make sure it was not stolen, as he always did.

*M.F.'s Injuries*

¶7   At trial, the sexual assault nurse examiner—who had performed a rape exam on M.F.—also testified. The nurse observed that M.F.'s dress was on inside out and photographed several injuries. Among the injuries were multiple genital injuries. Specifically, M.F. had abrasions, bruising, and a "little chunk of

---

[2] When asked whether she would be surprised to learn that her blood alcohol level was 0.09 at the hospital on May 30, M.F. responded that she would not be.

skin missing."[3] The nurse testified that anybody who sustained this last genital injury during consensual sex would stop the intercourse since it would "be very painful." The genital injuries, the nurse agreed, could be "consistent with non-consensual intercourse."

¶8    Besides the genital injuries, M.F.'s trachea was tender and slightly red. She also had a petechia ("redness of the skin that is caused by pressure," either sucking or pushing) on the neck, which the nurse testified is "the type of injury that is consistent with strangulation." M.F. had other symptoms that indicated strangulation too, including neck pain, difficulty swallowing, voice changes, and memory loss.

¶9    M.F. also had several bruises on her arms and legs, two scratches (one on the leg and one on the ankle), a blister on the right heel,[4] areas of redness and a petechia on her breasts, and redness on both shoulders and a scratch on one of them.

*The Rape Jury Instruction and the Verdict*

¶10   At the conclusion of the trial, the district court gave the following jury instruction: "'Rape' as defined in the law means the actor knowingly, intentionally, or recklessly has sexual intercourse with another without that person's consent."[5] Newton's counsel did not object to that instruction.

---

[3] The sexual assault nurse examiner testified this last injury would be caused, not by a penis, but by something sharp such as a fingernail. Newton argues that the injury is inconsistent with M.F.'s testimony because M.F. never testified that Newton used something other than his penis. The sexual assault nurse examiner, however, did testify that, during M.F.'s exam, M.F. answered that Newton touched her vagina with both his penis *and* a finger.

[4] The nurse reported that M.F. said this injury happened because she walked barefoot after the attack.

[5] The jury was also correctly instructed that a finding of rape was required to convict Newton of aggravated sexual assault. *See* UTAH CODE § 76-5-405.

*The Verdict, Posttrial Motions, and Appeal*

¶11 The jury convicted Newton of one count of aggravated sexual assault and aggravated assault and acquitted on the other charges. After trial but before sentencing, Newton obtained new counsel and moved for a new trial. Among the arguments raised in the motion was the claim that his trial counsel had provided ineffective assistance by failing to object to the rape jury instruction.

¶12 Besides arguing for ineffective assistance of counsel, Newton also contended that the State's failure to conduct a forensic examination of M.F.'s cell phone violated the disclosure requirements of *Brady v. Maryland*, 373 U.S. 83, 87 (1963). M.F.'s cell phone had been found about a year and a half after the assault and had been given to the police. The State never did a forensic examination of the cell phone, but had previously provided Newton with a copy of the call and text logs of M.F.'s cell phone.[6] In response to Newton's posttrial motion, the district court ordered a forensic examination of the cell phone, the findings of which were to be sent to the court for *in camera* review. The examination revealed that Newton's name and cell-phone number had been entered in M.F.'s cell phone at 3:09 a.m. on the date of the assault (while or near the time Newton and M.F. were at the Subway). It also showed multiple text messages and phone calls that had been received in the early morning hours that day, which "were consistent with the testimonies of friends and family trying to reach [M.F.] without response." The last sent text was at 2:10 a.m.; it "did not contain any reference to where [M.F.] was or what she was doing."

¶13 After the *in camera* review of the cell-phone evidence, the district court denied Newton's motion for a new trial. It concluded that Newton's ineffective-assistance-of-counsel claim

---

[6] Newton's counsel mentioned to the prosecution before trial that he would like to know what was on the cell phone. The State responded that it did not have "the ability to grant access to the phone." Counsel did not respond by moving to have the cell phone examined. The State did not examine the cell phone either. The prosecutor later testified that he "had no idea what was on the phone at all, one way or the other" and that he "had no reason to believe there was anything relevant on the phone."

failed because the jury instruction correctly required mens rea as to both the act of sexual intercourse and M.F.'s nonconsent. The district court likewise rejected Newton's *Brady* claim, determining that "[t]he evidence found on [M.F.]'s phone post-trial was unlikely to have affected the verdict." That was because, upon learning of the contact entry that took place at the Subway, the jury could have concluded that M.F. "had no bias" against Newton before the rape and because "[t]he [other] information found on the phone also corroborated [her] testimony that friends were trying to reach [M.F.] for hours without success."

¶14 Newton appealed. He raised several issues, including his arguments about the rape jury instruction and the alleged *Brady* violation. The court of appeals affirmed. *State v. Newton*, 2018 UT App 194, ¶ 38, 437 P.3d 429.

¶15 Newton filed a petition for certiorari, which we granted. We have jurisdiction under Utah Code section 78A-3-102(3)(a).

## STANDARD OF REVIEW

¶16 "On certiorari, we review the court of appeals' decision for correctness." *State v. Martinez-Castellanos*, 2018 UT 46, ¶ 32, 428 P.3d 1038 (citation omitted) (internal quotation marks omitted). The issues of ineffective assistance of counsel and due process are both mixed questions of law and fact. *State v. Mohamud*, 2017 UT 23, ¶ 10, 395 P.3d 133; *Jacobs v. State*, 2001 UT 17, ¶ 20, 20 P.3d 382. We review the legal questions involved for correctness and the factual findings for clear error. *Mohamud*, 2017 UT 23, ¶ 10.

## ANALYSIS

¶17 We granted certiorari as to whether the court of appeals erred in holding (1) that the district court had not erroneously instructed the jury on the elements of rape and (2) that the State did not violate the disclosure requirements of *Brady v. Maryland*, 373 U.S. 83, 87 (1963).[7]

---

[7] Newton also argues on appeal that trial counsel was ineffective in failing "to investigate and present exculpatory evidence." The court of appeals did not address this claim because Newton did not address the district court's decision in his appellate briefs. *State v. Newton*, 2018 UT App 194, ¶ 20, 437 P.3d 429. Since we did not grant certiorari as to this issue, we do not address it either.

¶18 We conclude that Newton's trial counsel was not ineffective in failing to object to the jury instruction. We also conclude that the State did not violate *Brady*'s disclosure requirements.

## I. NEWTON'S CLAIM FOR INEFFECTIVE ASSISTANCE OF COUNSEL FAILS

¶19 Newton asserts an ineffective-assistance-of-counsel claim under *Strickland v. Washington*, 466 U.S. 668 (1984).[8] He argues specifically that his trial counsel was ineffective by not objecting to the following jury instruction: "'Rape' as defined in the law means the actor knowingly, intentionally, or recklessly has sexual intercourse with another without that person's consent."

¶20 A claim for ineffective assistance of counsel requires Newton to show "(1) that counsel's performance was objectively deficient, and (2) a reasonable probability exists that but for the deficient conduct defendant would have obtained a more favorable outcome at trial." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162; *see also Strickland*, 466 U.S. at 687.

¶21 We first explain how the jury instruction was arguably ambiguous, without reaching the question of whether Newton's counsel was objectively deficient. And then we explain that, even

---

[8] Newton argues that this court should also review the rape jury instruction for plain error. The court of appeals reviewed this argument and held that, because the district court did not err in giving the instruction, there was no plain error. *Newton*, 2018 UT App 194, ¶ 17 n.6. Without opining on whether the court of appeals was correct in holding there was no error, we reject Newton's plain-error argument because "[p]roving plain error . . . requires proving that any errors by the trial court . . . prejudiced the defendant." *State v. McNeil*, 2016 UT 3, ¶ 25, 365 P.3d 699 (footnote omitted). This prejudice test is "the same whether under the claim of ineffective assistance or plain error." *State v. Beverly*, 2018 UT 60, ¶ 37, 435 P.3d 160 (citation omitted). And we hold below in our ineffective-assistance-of-counsel analysis that Newton was not prejudiced by any alleged error in the rape jury instruction. *See infra* ¶¶ 30–36. His plain-error argument consequently fails.

if Newton could show that counsel was objectively deficient, Newton cannot show that he was prejudiced by it. For that reason, his trial counsel was not ineffective.

### A. We Do Not Opine on Whether Trial Counsel's Performance Was Deficient

¶22 Newton argues that his trial counsel was objectively deficient by virtue of not objecting to the rape jury instruction. By failing to object, contends Newton, counsel did not make sure that the jury was "clearly and accurately instructed" about consent. And "no reasonable lawyer would have found an advantage in understating the mens rea requirement as applied to the victim's nonconsent." *State v. Barela*, 2015 UT 22, ¶ 27, 349 P.3d 676. Ultimately, we do not reach this issue. Although the jury instruction could have been clearer, Newton's ineffective-assistance-of-counsel claim fails for lack of prejudice.

¶23 To establish deficient performance, Newton must show that his counsel's "representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.

¶24 The court of appeals held that Newton's claim for ineffective assistance of counsel failed because Newton did not show that trial counsel performed deficiently. *State v. Newton*, 2018 UT App 194, ¶ 29, 437 P.3d 429. Specifically, Newton did not "demonstrate that counsel's objection to the rape instruction would not have been futile." *Id.* ¶ 23; *see State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546 ("Failure to raise futile objections does not constitute ineffective assistance of counsel."). In coming to that conclusion, the court of appeals examined two Utah cases about jury instructions for rape: *Barela*, 2015 UT 22, and *State v. Marchet*, 2009 UT App 262, 219 P.3d 75. *Newton*, 2018 UT App 194, ¶¶ 24–29. Because these cases are relevant to our analysis here, we set out their pertinent facts and holdings.

¶25 The court of appeals held in *Marchet* that the rape instruction "accurately identified each element of the crime of rape and correctly stated the applicable mental state." 2009 UT App 262, ¶ 22. The instruction in that case required the jury to find the defendant guilty of rape if it found the following:

1. "That [the defendant] had sexual intercourse with [the victim];"

2. "That said act of intercourse was without the consent of [the victim];" and

3. "That the defendant acted intentionally or knowingly or recklessly."

*Id.* ¶ 21. This instruction, said the court of appeals, was an "accurate statement of the law" because it required a finding that the defendant "intentionally, knowingly, or recklessly had nonconsensual sexual intercourse with" the victim. *Id.* ¶ 22.

¶26 We fielded a similar ineffective-assistance-of-counsel claim in *Barela* and held—in contrast to *Marchet*—that trial counsel was deficient in failing to object to the jury instruction for rape. 2015 UT 22, ¶ 2. The instruction there required the jury to convict the defendant of rape if it found the following:

1. "The defendant"

2. "Intentionally or knowingly;"

3. "Had sexual intercourse with [the alleged victim];" and

4. "That said act of intercourse was without the consent of [the alleged victim]."

*Id.* ¶ 13. This instruction was erroneous, we explained, because it "implied that the mens rea requirement ('intentionally or knowingly') applied *only* to the act of sexual intercourse, and not to [the alleged victim's] nonconsent" and "conveyed that idea by coupling the mens rea requirement directly with the element of sexual intercourse, and by articulating the element of [the alleged victim's] nonconsent without any apparent counterpart requirement of mens rea." *Id.* ¶ 26 (footnote omitted). We distinguished the instruction from the one in *Marchet* without opining on whether the *Marchet* instruction was correct: "[T]he instruction in [*Marchet*] differed from the one here in a crucial respect: the mens rea element was listed last, after both the 'sexual intercourse' and 'nonconsent' elements. That instruction at least arguably suggests that the mens rea element applies to all of the above-listed elements." *Id.* ¶ 26 n.3 (citation omitted). Then we held that "reasonable trial counsel should have objected to" the *Barela* instruction, since "no reasonable lawyer would have found an advantage in understating the mens rea requirement as applied to the victim's nonconsent." *Id.* ¶ 27.

¶27 The court of appeals in Newton's case ultimately concluded that Newton's trial counsel was not deficient because an objection would have been futile under *Barela* and *Marchet*. *Newton*, 2018 UT App 194, ¶¶ 28–29. Unlike in *Barela*, said the court of appeals, the rape instruction here "did not separate the

mens rea from the act or the element of non-consent." *Id.* ¶ 26. And the court of appeals believed that Newton's instruction was even better than the *Marchet* instruction because, "[r]ather than providing the culpable mental state as a catch-all at the end of the instruction, Newton's instruction seamlessly provided that the applicable mens rea applied to both the act of sexual intercourse and Victim's non-consent." *Id.* ¶ 28.

¶28 Because Newton's claim for ineffective assistance fails for lack of prejudice, *infra* ¶¶ 30–36, we need not decide whether the court of appeals was correct in holding that an objection to the jury instruction would have been futile. We write only to say that the jury instruction is more ambiguous than acknowledged by the court of appeals. A correct jury instruction on rape should require a finding "not only that a defendant 'knowingly, intentionally, or recklessly had sexual intercourse,' but also that he had the requisite mens rea as to the victim's nonconsent." *Barela*, 2015 UT 22, ¶ 26 (citation omitted). But using a purely grammatical interpretation, the mental state in Newton's jury instruction could arguably be read as applying to either the act of sexual intercourse or the victim's nonconsent, or both. On that basis, the jury perhaps could have interpreted the instruction to mean that there was no mens rea requirement as to the victim's nonconsent. That being said, we do not opine on whether trial counsel was deficient in failing to object to the instruction, since Newton was not prejudiced by any potential misstep.[9]

---

[9] There is a strong argument that a reasonable attorney could have concluded that the instruction was correct under controlling precedent. At the time of trial, Newton's counsel did not have the benefit of *Barela*, since that opinion had not been issued yet. Trial counsel thus would have been able to rely on *Marchet* only—and not *Barela*—for guidance. *See Menzies v. State*, 2014 UT 40, ¶ 76, 344 P.3d 581 ("Importantly, in assessing whether counsel's performance was deficient, we must look at the facts and law available to counsel at the time of the representation."). And this court has said that the *Marchet* "instruction at least arguably suggests that the mens rea element applies to all of the . . . elements [of rape]." *Barela*, 2015 UT 22, ¶ 26 n.3. Because the instruction here was somewhat similar to the instruction upheld in *Marchet*, there is a strong argument that a reasonable attorney at that time would not have objected to it. But we ultimately need

(continued . . .)

¶29 Going forward, however, district courts should ensure that jury instructions for rape clearly require a finding that a defendant "had the requisite mens rea as to the victim's nonconsent." *Id.* They can accomplish that task simply by using Model Utah Jury Instruction 1605:

> (DEFENDANT'S NAME) is charged [in Count__] with committing Rape [on or about DATE]. You cannot convict [him][her] of this offense unless, based on the evidence, you find beyond a reasonable doubt each of the following elements:
>
>    1. (DEFENDANT'S NAME);
>
>    2. Intentionally, knowingly, or recklessly had sexual intercourse with (VICTIM'S NAME);
>
>    3. Without (VICTIM'S NAME)'s consent; and
>
>    4. (DEFENDANT'S NAME) acted with intent, knowledge or recklessness that (VICTIM'S NAME) did not consent.

MODEL UTAH JURY INSTRS. 2d CR1605 (Advisory Comm. On Criminal Jury Instructions 2015), https://www.utcourts.gov/resources/muji/inc_list.asp?action=showRule&id=44#1605. There is no wiggle room in that instruction as to whether the mens rea requirement applies to the act of sexual intercourse, the victim's nonconsent, or both. We thus endorse its use.

### B. Newton Was Not Prejudiced by
### Counsel's Failure to Object to the Jury Instruction for Rape

¶30 Newton claims that he was prejudiced by counsel's failure to object to the rape jury instruction, arguing that because Newton admitted to having sexual intercourse with M.F., "consent was the only element at issue." And, he urges, "[g]iven the totality of the evidence . . . , a reasonable jury could have concluded that the truth about the incident was somewhere in the middle of Newton's version and [M.F.]'s version." We disagree. The totality of the evidence—including Newton's and M.F.'s testimony and her extensive injuries—does not support a finding

---

not decide the issue because Newton's ineffective-assistance-of-counsel claim fails on the prejudice prong. *See infra* ¶¶ 30–36.

that Newton was mistaken as to M.F.'s nonconsent. So even if Newton's counsel were deficient in failing to object to the jury instruction, Newton has not shown that he was prejudiced by the error.

¶31 Under the second prong of an ineffective-assistance-of counsel-claim, "the defendant bears the burden of proving that counsel's errors actually had an adverse effect on the defense and that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *State v. Beverly*, 2018 UT 60, ¶ 30, 435 P.3d 160 (citation omitted). To show a reasonable probability, the defendant must show "a probability sufficient to undermine confidence in the outcome." *Id.* (citation omitted). When a court considers whether the defendant has cleared this high hurdle, it "must consider the totality of the evidence before the . . . jury." *Id.* (citation omitted). And thus, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* (citation omitted).

¶32 We held in *Barela* that the defendant was prejudiced when trial counsel failed to object to a jury instruction misstating the requirement of mens rea as applied to the elements of rape. 2015 UT 22, ¶ 2. In *Barela*, the defendant, a massage therapist, had sex with his client at a massage studio. *Id.* ¶ 4. He said that the woman initiated the conduct and that it was consensual. *Id.* ¶ 5. In contrast, she said the defendant unexpectedly began rubbing her inner thigh, pulled her to the end of the massage table, dropped his pants, and began having vaginal sex with her. *Id.* ¶ 6. In response she neither physically resisted nor verbally told the defendant "no." *Id.* ¶ 7. She instead said and did nothing; she "just froze." *Id.* We held that the defendant was prejudiced by counsel's failure to object to the jury instruction because, if the instruction "had clearly and correctly required the jury to find mens rea as to [the alleged victim's] nonconsent, the jury could reasonably have acquitted [the defendant] on the basis of a determination that he mistook [the alleged victim's] reaction for consent." *Id.* ¶ 28. And thus, "a reasonable jury . . . could have acquitted [the defendant] if correctly instructed—on the basis of a

determination that [he] had neither knowledge nor recklessness as to [the alleged victim's] nonconsent." *Id.* ¶ 32.[10]

¶33 Unlike the defendant in *Barela*, Newton has not shown that, but for his counsel's errors, the jury could have reasonably acquitted him on the basis of a determination that he mistook M.F.'s reaction for consent. To be sure, the record contains two competing versions of what happened on the morning of the assault. But neither supports a finding that Newton mistook M.F.'s actions for consent. That is because, in Newton's version, M.F. unambiguously consented to—and even initiated—sexual intercourse. In M.F.'s version, however, M.F. unambiguously resisted by "fighting back" and "screaming and crying and pushing [Newton]." In her version, Newton even choked her and threatened her with a gun to force her to have sex with him.

¶34 Neither version gave the jury evidence from which it could reasonably conclude that M.F. did not consent but that Newton mistook her reaction as consent. Unlike in *Barela*, there is no evidence that M.F., for example, "froze" during the encounter, neither physically resisting Newton nor verbally telling him "no." *See id.* ¶ 7. And Newton points to no other evidence that he mistook M.F.'s actions for consent. Indeed, the evidence shows only that she either fought back or initiated the sex. As a result, the jury could not "easily have thought that the truth fell somewhere in between the two accounts," *id.* ¶ 30, as Newton argues. So in convicting Newton, the jury must have found that M.F. did not consent and, by extension, must have concluded that Newton "intentionally, knowingly, or recklessly had *nonconsensual* sexual intercourse" with M.F. *See Marchet*, 2009 UT App 262, ¶ 22 (emphasis added).

¶35 Besides there being no testimony as to ambiguous consent, M.F.'s version was also corroborated by M.F.'s extensive injuries. The record contains evidence that M.F. had been strangled and evidence that M.F. had a genital injury that would

---

[10] In finding prejudice in *Barela*, we relied on the fact that the alleged victim "just froze," and we distinguish Newton's case, in part, on that basis. But by so doing, we do not intend to endorse the premise that when a victim responds to a sexual advance by "freezing," the defendant automatically has a viable defense to rape (mistake as to the victim's nonconsent).

have been so painful that she would have stopped any consensual sexual intercourse. Plus, she had multiple bruises on her legs and arms. Newton's evidence at trial did not account for those injuries;[11] M.F.'s did. As a result, this evidence supports a finding that Newton used force during the sexual intercourse and, in turn, a finding that he knew that M.F. did not consent to the intercourse.

¶36  In the end, even if the jury instruction were clearer as to mens rea for nonconsent, a reasonable jury could not have acquitted Newton based on "a determination that [he] had neither knowledge nor recklessness as to [the alleged victim's] nonconsent." *Barela*, 2015 UT 22, ¶ 32. Thus Newton has not shown "a probability sufficient to undermine confidence in the outcome," *Beverly*, 2018 UT 60, ¶ 30, and his ineffective-assistance-of-counsel claim fails for lack of prejudice.

## II. NEWTON'S BRADY CLAIM FAILS

¶37 Next, Newton argues that his convictions should be reversed because the State violated the disclosure requirements of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), by refusing to conduct a forensic examination of M.F.'s cell phone. To establish a *Brady* violation, a defendant must show (1) that the prosecution suppressed evidence, (2) that the evidence is favorable to the accused, and (3) that the evidence is material to either guilt or to punishment. *Id.* Because Newton's *Brady* claim fails under the first

---

[11] Newton argues in his reply brief that the sexual assault nurse examiner's testimony about the bruises is undermined by a private investigator's posttrial testimony that he interviewed people who told him that M.F. had sex with her boyfriend "out in the wilderness in the forest in some area" the day before the sexual assault. Newton argues that the sexual assault nurse examiner did not know about that alleged event and so her testimony about the bruises was ill informed. This alleged incident, however, was not in the trial testimony, and we do not consider it on appeal for the purposes of prejudice. And even if we were to consider it, it would not change the outcome of our analysis: Newton points to no testimony—even posttrial testimony—that M.F. *sustained injuries* during that alleged incident in the forest.

and third elements, we affirm the court of appeals without addressing the second element.

*A. The Prosecution Did Not Suppress Evidence*

¶38 Newton argues that the prosecution had "a constitutional obligation to seek out any evidence on [M.F.'s] phone, regardless of whether it thought that the phone would contain anything of value" because "[p]rosecutors have an affirmative duty to seek out, analyze, i.e., look at the evidence solely within the hands of the prosecution team." The court of appeals rejected this argument, holding that "the State did not commit a *Brady* violation when it did not independently conduct a forensic examination of [M.F.]'s cell phone." *State v. Newton*, 2018 UT App 194, ¶ 34, 437 P.3d 429.

¶39 Under the first prong of the *Brady* analysis, a prosecutor must "disclose *known*, favorable evidence rising to a material level of importance." *Kyles v. Whitley*, 514 U.S. 419, 438 (1995) (emphasis added). This, in turn, requires a prosecutor to "learn of any favorable evidence *known* to the others acting on the government's behalf in the case, including the police." *Id.* at 437 (emphasis added).[12] But a prosecutor generally has no duty "to search for exculpatory evidence, conduct tests, or exhaustively pursue every

---

[12] We note that some federal cases at first blush seem to impose a duty on a prosecutor to obtain "readily available" information even when the prosecutor is unaware of the information. But a deeper reading reveals that these cases all deal with the prosecutor's duty to get information from other government actors or entities. *See, e.g.*, *United States v. Perdomo*, 929 F.2d 967, 971 (3d Cir. 1991) (holding that prosecutor's failure to check local Virgin Islands records for the criminal background of a key prosecution witness was a *Brady* violation because the information was readily available); *United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980) (holding that the government had knowledge for purposes of *Brady* of the criminal record of a key witness when it chose not to run an FBI or NCIC check on the witness and the criminal record was readily available to it). They are not applicable here, however, because this case is about the prosecution's duty to conduct tests on evidence—not its duty to search for evidence known to other government actors such as criminal records.

angle on a case." *State v. Shaffer*, 725 P.2d 1301, 1305–06 (Utah 1986) (citation omitted) (holding that the cremation of the victim's body before gunshot-residue tests were performed was not a *Brady* violation when "evidence of gunshot residue offered a 'mere possibility' of evidence favorable to the defendant").[13] Such duty arises under *Brady* only when "the exculpatory value of untested . . . evidence" is "apparent." *State v. Bakalov*, 1999 UT 45, ¶¶ 49–50, 979 P.2d 799 (holding that there was no *Brady* violation when the State did not test a semen sample); *see also Arizona v. Youngblood*, 488 U.S. 51, 56–58 (1988) (holding that the police's failure to perform tests on semen samples did not violate the Due Process Clause, absent bad faith); *People ex rel. Gallagher v. Dist. Court In & For Arapahoe Cty.*, 656 P.2d 1287, 1291–92 (Colo. 1983) (holding that the police's failure to conduct a trace-metal test on victim's hands before burial was a suppression of evidence when it was "implausible" that the "test had no value").

¶40 The State had no duty under *Brady* to conduct a forensic examination of M.F.'s cell phone. Nothing indicates that the prosecution or another government actor *knew* of any favorable, material evidence that would be revealed by conducting a forensic examination of the cell phone. Instead, "this evidence was simply an avenue of investigation that might have led in any number of directions." *Youngblood*, 488 U.S. at 56 n.*. Indeed, the prosecutor testified at a posttrial hearing that he "had no idea what was on the phone at all, one way or the other," and that he "had no reason to believe there was anything relevant on the phone." Although Newton has made the bald assertion that "the prosecutor intentionally stuck his head in the sand," he has not provided evidence that the exculpatory value of testing the cell

---

[13] *See also Arizona v. Youngblood*, 488 U.S. 51, 59 (1988) ("[T]he police do not have a constitutional duty to perform any particular tests."); *State v. Rhodes*, 543 P.2d 1129, 1133 (Ariz. 1975) (holding that failure to take fingerprints from certain areas of or items in a crime scene was not a *Brady* violation); *People ex rel. Gallagher v. Dist. Court In & For Arapahoe Cty.*, 656 P.2d 1287, 1291 (Colo. 1983) ("[P]olice investigators have no general duty to search out possible exculpatory evidence or to perform tests to determine marginally relevant facts that, with the benefit of hindsight, a defendant might speculate would have been of possible value to support his defense against a criminal charge.").

phone—if there was any—was *apparent*. Thus the State did not violate *Brady* when it did not complete a forensic examination of the cell phone.

### B. Evidence on the Cell Phone Was Not Material

¶41  Newton also argues that the evidence discovered through the posttrial forensic examination of the phone was material. We disagree. And so, in addition to failing on the suppression prong, Newton's *Brady* claim independently fails on the materiality prong.

¶42  Evidence is material for the purposes of *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "A 'reasonable probability' of a different result is one in which the suppressed evidence undermines confidence in the outcome of the trial." *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017) (citation omitted) (internal quotation marks omitted). And therefore "[t]he possibility that [the evidence] could have exculpated [the defendant] if . . . tested is not enough to satisfy the standard of constitutional materiality . . . . " *Youngblood*, 488 U.S. at 56 n.*. We determine the materiality by evaluating "the withheld evidence in the context of the entire record." *Turner*, 137 S. Ct. at 1893 (citation omitted) (internal quotation marks omitted).

¶43  Newton makes a single argument about the cell-phone evidence's materiality. He says that the fact "that M.F. entered Newton as a contact in her phone the morning of the alleged incident" would have contradicted "M.F.'s testimony that Newton was 'weird and creepy,' and that she never flirted with him, told him she hated him, and had a boyfriend of her own." The evidence of the contact entry, contends Newton, "would have allowed counsel to thoroughly cross-examine M.F. as to why, where she had a boyfriend, she would want Newton's contact information."

¶44  The court of appeals held that the district court did not err when it determined that the evidence collected from M.F.'s cell phone was not material. *Newton*, 2018 UT App 194, ¶¶ 35–37. In so doing, it implicitly endorsed the district court's view that the evidence "could show only that Victim had 'no bias' against Newton prior to the rape, and it corroborated Victim's account that her friends unsuccessfully attempted to contact her during the incident." *Id.* ¶ 36. It also noted that M.F. "testified on direct

and cross-examination that after telling Newton that she thought he was 'weird and creepy,' 'he was nice after that.'" *Id.* ¶ 37. And Newton did not "explain how entering his phone number before the rape would have 'provided circumstantial evidence of consent.'" *Id.*

¶45  We agree with the court of appeals. Newton has failed to show any likelihood that a pretrial examination of the cell phone would have affected the outcome of his trial. Thus the evidence learned from the forensic examination of the cell phone was not material. It was consistent with M.F.'s testimony that she was friendly with Newton before he attacked her. As the court of appeals acknowledged, even though M.F. described her initial impression of Newton as "weird and creepy," she also said that "he was nice after that." *Id.* And as the State notes, the jury also heard other evidence of M.F.'s attitude toward Newton—i.e., her acceptance of his invitation to ride alone with him at 3:00 a.m. to Subway and video footage showing her with Newton and seemingly happy at Subway. Neither did the evidence of the contact entry impeach M.F.'s testimony that she did not flirt with Newton and that she had a boyfriend. The State summed it up well: "One may note another's contact information for any number of reasons. The significance of the evidence was therefore ambiguous at best."

¶46 In the end, the cell-phone evidence "adds nothing to [Newton]'s case and would not have raised a reasonable doubt as to his guilt." *State v. Shabata*, 678 P.2d 785, 788 (Utah 1984). The cell-phone evidence was thus not material, and the State did not violate *Brady* by not conducting a forensic examination on the cell phone.

## CONCLUSION

¶47 Newton was not prejudiced by the rape jury instruction. And the State had no duty under *Brady* to conduct a forensic examination on the phone. We thus affirm the decision of the court of appeals.

————

JUSTICE PETERSEN, concurring:

¶48  In this opinion, we endorse the Model Utah Jury Instruction for rape. MODEL UTAH JURY INSTRS. 2d CR1605 (Advisory Comm. On Criminal Jury Instructions 2015), https://www.utcourts.gov/resources/muji/. I agree with this endorsement, based on the relevant statutes. But I write to flag a

problem with the fourth element of the instruction, which relates to the defendant's mens rea as to the victim's nonconsent. The Model Utah Jury Instruction committee appears also to have noted this issue.

¶49 Model Utah Jury Instruction 1605 provides a clear instruction for the offense of rape. It states:

> (DEFENDANT'S NAME) is charged [in Count__] with committing Rape [on or about DATE]. You cannot convict [him][her] of this offense unless, based on the evidence, you find beyond a reasonable doubt each of the following elements:
>
> 1. (DEFENDANT'S NAME);
>
> 2. Intentionally, knowingly, or recklessly had sexual intercourse with (VICTIM'S NAME);
>
> 3. Without (VICTIM'S NAME)'s consent; and
>
> 4. (DEFENDANT'S NAME) acted with intent, knowledge or recklessness that (VICTIM'S NAME) did not consent.

*Id.*; *see also supra* ¶ 29.

¶50 The fourth element of the instruction relates to the defendant's mental state as to the victim's nonconsent—in other words, the defendant's awareness that the victim did not consent to the intercourse. It requires the prosecution to prove that the defendant acted with "*intent, knowledge or recklessness* that [the victim] did not consent." MODEL UTAH JURY INSTRS. 2d CR1605 (Advisory Comm. On Criminal Jury Instructions 2015), https://www.utcourts.gov/resources/muji/ (emphasis added).

¶51 This is correct under the applicable statutes. The rape statute does not specify a particular mental state for the offense of rape in general, or for the defendant's mental state as to the victim's nonconsent in particular. *See* UTAH CODE § 76-5-402. In such a situation, Utah Code section 76-2-102 directs that "when the definition of the offense does not specify a culpable mental state and the offense does not involve strict liability," then "*intent, knowledge, or recklessness* shall suffice to establish criminal responsibility." (Emphasis added.) We have concluded that this statute requires us to include intent, knowledge, or recklessness as the applicable mental states for the victim's nonconsent.

¶52 But while "knowledge" and "recklessness" make sense in this context, "intent" does not. Knowledge and recklessness can

relate to a person's awareness of the circumstances surrounding the person's conduct. Here, the relevant surrounding circumstance is that the person with whom the defendant is having intercourse does not in fact consent to the intercourse. The legislature has explained that a person engages in conduct "[k]nowingly, or with knowledge, with respect . . . to circumstances surrounding his conduct when he is *aware of the . . . existing circumstances*." UTAH CODE § 76-2-103(2) (emphasis added). And a person engages in conduct "[r]ecklessly with respect to circumstances surrounding his conduct . . . when he is *aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist*." *Id.* § 76-2-103(3) (emphasis added).

¶53 Knowledge and recklessness are compatible with the fourth element of the rape jury instruction. The prosecution must prove either that: (1) the defendant knew that the victim did not consent—i.e., the defendant was aware that the victim did not consent; or (2) the defendant was reckless as to whether the victim did not consent—i.e., the defendant was aware of but consciously disregarded a substantial and unjustifiable risk that the victim did not consent.

¶54 In contrast, the meaning of "intent" does not correspond to a person's *awareness* of a surrounding circumstance. Rather, the legislature has explained that a person engages in conduct "[i]ntentionally, or with intent . . . with respect to the nature of his conduct or to a result of his conduct, when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 76-2-103(1).

¶55 While a person may *intend* to engage in nonconsensual intercourse by, for example, rendering another person unconscious and then having sex with that person, this is not a substitute for the requisite mens rea for the victim's nonconsent. The prosecution must prove that the victim did not, in fact, consent (element three). Then, element four requires the prosecution to prove that the defendant was *aware* that the victim did not actually consent. A defendant's intent for the victim to be unconscious and nonconsenting is substantively different than his awareness of the actual fact that the person with whom he had intercourse did not consent to it. Certainly, evidence that a defendant intentionally drugged a victim into unconsciousness would be relevant to prove that the defendant was aware the victim was not consenting during intercourse. But the two concepts are legally distinct. And element four requires proof of

the latter concept. Accordingly, the mens rea for the victim's nonconsent in element four should be knowledge or recklessness, but not intent.

¶56 The Model Utah Jury Instruction committee seems to have also made this observation. It has commented that "[a]lthough the committee believes that the applicable mens rea as to element 4 would be knowledge or recklessness, it has included intent based on the Utah Supreme Court's opinion in *State v. Barela*, 2015 UT 22." MODEL UTAH JURY INSTRS. 2d CR1605 committee notes (Advisory Comm. On Criminal Jury Instructions 2015), https://www.utcourts.gov/resources/muji/.

¶57 I agree with the committee that "intent" is incompatible with the mens rea for the victim's nonconsent. However, I concur with the majority opinion on this point because I conclude that Utah Code section 76-2-103(2) does not give us the freedom to exclude "intent" of our own accord in element four. I write separately to raise this issue, however, for possible refinement by the legislature if it so chooses.

———————