*This opinion is subject to revision before final publication in the Pacific Reporter*

**2025 UT 50**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

BRIAN NEWTON,
*Appellant,*

*v.*

STATE OF UTAH,
*Appellee.*

No. 20230979
Heard May 14, 2025
Filed November 6, 2025

On Direct Appeal

Third District Court, Salt Lake County
The Honorable Paul B. Parker
No. 210902591

Attorneys:

Ann M. Taliaferro, Dain Smoland, Salt Lake City, for appellant

Derek E. Brown, Att'y Gen., Daniel L. Day, Asst. Solic. Gen.,
Salt Lake City, for appellee

CHIEF JUSTICE DURRANT authored the opinion of the Court, in
which ASSOCIATE CHIEF JUSTICE PEARCE, JUSTICE PETERSEN,
JUSTICE HAGEN, and JUDGE HARRIS joined.

Having recused herself, JUSTICE POHLMAN does not participate
herein; COURT OF APPEALS JUDGE RYAN M. HARRIS sat.

CHIEF JUSTICE DURRANT, opinion of the Court:

## INTRODUCTION

¶1 A jury convicted Brian Newton of aggravated sexual
assault and aggravated assault for raping a woman at gunpoint in
his car. Newton appealed his conviction to the court of appeals and

ultimately to this court. Both courts upheld his convictions.[1] Newton then filed a petition for postconviction relief, which he later amended. In response to his amended petition, the State filed a motion for summary judgment, seeking to dismiss Newton's claims. Newton then filed a response to the State's motion for summary judgment, including in the same document a cross-motion for summary judgment.

¶2 The postconviction court granted the State's motion for summary judgment, and it struck Newton's motion for summary judgment as procedurally inappropriate under the Post Conviction Remedies Act (PCRA) and Utah Rules of Civil Procedure. The court also agreed with the State that postconviction petitioners may not, as a rule, file motions for summary judgment.

¶3 We hold that the postconviction court correctly granted the State's motion for summary judgment. And we affirm that the PCRA and Utah Rules of Civil Procedure prohibited Newton from filing a combined response and motion in a single document in response to the State's motion for summary judgment. But we clarify that nothing in our rules or the PCRA precludes a petitioner from filing a motion for summary judgment in postconviction proceedings.

## BACKGROUND

¶4 In June 2012, the State charged Newton with two counts of aggravated sexual assault for using or threatening to use a dangerous weapon during a rape or forcible sodomy, one count of aggravated kidnapping for using or threatening to use a dangerous weapon while committing an unlawful detention or kidnapping, and one count of aggravated assault for using a dangerous weapon during an assault. At trial, the jury found Newton guilty of one count of aggravated sexual assault and one count of aggravated assault; it acquitted him on the other charges. The trial court sentenced Newton to concurrent prison terms of ten years to life for the aggravated sexual assault conviction and zero to five years for the aggravated assault conviction.

¶5 After exhausting his direct appeals, Newton filed a petition for postconviction relief. The State moved for summary judgment, and the postconviction court granted the motion,

---

[1] *State v. Newton*, 2018 UT App 194, ¶ 1, 437 P.3d 429, *aff'd*, 2020 UT 24, ¶ 1, 466 P.3d 135.

dismissing Newton's petition. We recite here the undisputed material facts relevant to Newton's arguments on appeal, as found in (1) the record evidence at trial, (2) the State's motion for summary judgment, and (3) Newton's memorandum in response to the State's summary judgment motion.[2]

*A. Evidence at Trial*

¶6   On May 29, 2012, Monica[3] went to a party at her friend's West Valley City home, where Newton was among the attendees. Monica and Newton had first met at lunch earlier that same day. Monica talked briefly with Newton at the party. Monica, Newton, and the other guests drank alcohol. In the early morning, a little before 3:00 a.m., Newton and Monica decided to go to a Subway sandwich store for something to eat.

¶7   Both Monica and Newton testified at trial, though their version of the evening's events diverged greatly. Monica testified as follows:

• She told Newton at the party that she hated him because, based on the "vib[e]s he gave off," he was "weird and creepy," though he was "nice after that." She did not flirt or have any physical contact with Newton at the party or at the Subway.

• After leaving the Subway, Newton unexpectedly pulled into a truck stop, got out of the car, and reentered the car on the passenger's side. Newton then climbed on top of Monica, forcibly removed her clothing, and proceeded to rape her.

• Monica fought back, "screaming and crying and pushing Newton," but could not get him off her. Newton placed one

---

[2] The records from the original trial and appeals are deemed part of the record before the district court on the petition for postconviction relief. UTAH R. CIV. P. 65C(n)(3). And summary judgment is appropriate "when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Ross v. State*, 2012 UT 93, ¶ 18, 293 P.3d 345 (cleaned up), *abrogated on other grounds by McCloud v. State*, 2021 UT 51, 496 P.3d 179. In assessing and summarizing the facts, "we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Id.* (cleaned up).

[3] A pseudonym.

hand on her throat, squeezing her neck and making it difficult to breathe.

- During the rape, Newton retrieved a gun from near the pedals on the driver's side and held it to Monica's head, telling her that if she would be quiet and let him finish, he would take her back to the party. The rape continued for what "felt like forever but . . . was probably like an hour."

- Once finished, Newton got out of the car and went back to the driver's side. Monica put her clothing back on.

- While they were driving away, Newton remarked that "he did not know whether he would kill [Monica]." Newton said he was going to take Monica back to her friend Helen's[4] house, and not to the house where the party had taken place.

- After driving for about a half hour, Newton slowed at a red light, and Monica opened the door and jumped out of the car, running toward the nearest neighborhood she could find. She kept running until she found Bangerter Highway. She then walked until she reached the exit nearest Helen's house. She walked up to a gas station, and a man asked if she needed any help because she wasn't wearing any shoes. The man gave Monica a ride to Helen's house.

- Monica told Helen and others that were at the home that Newton had raped her and that he had a gun. A police officer arrived soon after and spoke with Monica. He told Monica that she should go to a hospital. At the hospital, Monica spoke with both another officer and Sexual Assault Nurse Examiner (SANE) Monique Turner (SANE Turner), who conducted a rape exam.

¶8 Newton testified to a different version of events, describing a consensual sexual encounter, rather than the forcible rape testified to by Monica. He stated as follows:

- Newton and Monica flirted during the party and laughed and joked together at Subway.

- On their way back from Subway, Monica placed her hand on Newton's leg, he reciprocated, and Monica began to touch him sexually. So he pulled over into a truck stop, where she climbed on top of him and they proceeded to kiss and then

---

[4] A pseudonym.

engaged in intercourse. At some point, they moved over to the passenger seat without leaving the car.

- Afterward, Newton climbed back to the driver's seat and gave Monica her clothes back. They both got dressed.

- Newton did not remember how to get to the house where the party was, so he drove Monica to her friend Helen's house instead. He believed Monica also lived there. On the way, Monica fell asleep in the car.

- When they reached Helen's house, Newton helped Monica to the front porch. After confirming that she was okay to get inside, he left her sitting on a bench on the front porch and drove to his parents' house to sleep. A few hours later, he was woken up by constant phone calls, asking him where Monica was.

- Newton acknowledged that there was a gun in the car—which he kept in a gun safe under the driver's seat—but he denied ever removing the gun from the safe during their encounter, stating that he opened the safe only to check the weapon each time he entered his car. He also denied ever threatening Monica or using force.

¶9   A South Jordan police officer testified that he was on patrol on the morning of May 30, 2012, when he received a call that a "motorist on Bangerter Highway saw a female walking down Bangerter Highway without any shoes on." He said responding officers were unable to locate or identify the female, but he was dispatched soon after to follow up on Monica's report of an aggravated rape. The officer testified that when he met Monica at her friend's house, she was "shaken up," wearing her dress inside out, and had a red mark on her neck as well as scratches on her legs.

¶10   Monica's friend Helen testified that her sister and a friend woke her around 4:00 a.m., saying they could not find Monica. She said they were able to contact Newton, who said he dropped Monica off at Helen's house and did not know where she was. Helen and the others then called the police from Helen's house. Helen testified that Monica "came running through the door, her dress was inside out, she wasn't wearing any shoes, she looked horrible." She added that Monica's "hair was messed up," "[h]er feet were messed up," and "she looked like she was covered in dirt." Helen said that Monica "wasn't coherent," but the "first thing she said" was "[h]e had a gun, he had a gun, he had a gun."

¶11 The investigating detective testified to interviewing Monica several times. He noted that she "was very straightforward and honest" when he interviewed her and that changes in the details of a victim's story between interviews did not indicate dishonesty but might suggest trauma. The officer also described searching Newton's car and finding a gun safe he described as "quick access," which Newton could open by pressing a few buttons to enter a combination.

¶12 SANE Turner also testified. She noted that when Monica came to the hospital, her dress was on inside out. She testified briefly that trauma can have an impact on memory, making it difficult to remember events accurately afterward. But after Newton's trial counsel (Trial Counsel) objected, the State directed her to other topics.

¶13 SANE Turner described observing Monica with various injuries, including petechiae and redness on her neck, consistent with strangulation. She noted that Monica exhibited other symptoms of strangulation, including neck pain, pain and difficulty swallowing, voice changes, sore throat, and weakness in her arms and legs. SANE Turner also testified to observing tenderness and redness on Monica's trachea, other areas of redness, multiple bruises, and a blister on Monica's foot.

¶14 SANE Turner testified that her examination revealed multiple genital injuries. She noted that a test using blue dye to show injuries not visible to the naked eye showed "dye uptake" in the "entire area around perihymenal/minora," though part of that area was mucous membrane so it would show dye uptake regardless of injury. She opined that the genital injuries would have been "painful" and that their location and nature were consistent with non-consensual intercourse. She suggested that in consensual intercourse, a woman with those injuries would stop or change positions.

¶15 SANE Turner described the case as "unusual" and, when prompted by the State, opined that "[i]t was more violent than the other cases that [she] ha[d] gone on" and that "very infrequently ha[d] [she] done a case that involves a lot of violence, especially a gun." She testified that she usually takes about twenty-five photos during a rape exam; in this case she took seventy-eight photos. And she explained that "[b]ecause there were so many injuries [she] didn't write" how each injury was caused "after every single one." Instead, she noted that the cause was unknown except for one

bruise that predated the encounter but stated generally that Monica told her "he was just really rough."

¶16 The State admitted more than fifty exhibits at trial, including many of SANE Turner's photographs, photographs of Newton's car and gun safe, and the text and call log from Monica's phone. The State also admitted a DNA laboratory report through a police officer, who explained only that the report showed a match between Newton's DNA and the seminal fluid found on Monica during the SANE exam.

¶17 A witness also testified to finding a cell phone in the area behind Newton's former house, sitting on top of some old equipment. He said it did not seem like the phone had been there for long. He testified that he was able to charge the phone and call the owner, Monica, and that a Salt Lake City policeman later came to pick up the phone. The detective on the case testified that when he saw the phone, it was "dirty, battered, scratched," and "extremely weathered."

¶18 At the conclusion of the trial, the jury found Newton guilty of one count of first-degree aggravated sexual assault and one count of third-degree aggravated assault.

*B. Posttrial Proceedings and Direct Appeal*

¶19 After trial, Newton secured new counsel for posttrial proceedings (New Counsel). New Counsel made several posttrial motions.

¶20 New Counsel moved to arrest judgment and for a new trial, alleging that the State committed a *Brady* violation by not disclosing the contents of Monica's cell phone.[5] New Counsel moved to have Monica's cell phone forensically examined, and the State objected based on concerns for Monica's privacy. The trial court then ordered the phone to be examined by a forensics lab, and it reviewed the lab's findings in camera. The court found relevant that at 3:09 a.m., around the time Monica and Newton were at Subway, Newton's name was added to the phone's contacts. The court concluded that the phone contained no other new relevant evidence.

¶21 New Counsel also moved to arrest judgment and requested an evidentiary hearing on the grounds that Trial Counsel

---

[5] *See Brady v. Maryland*, 373 U.S. 83 (1963).

had been ineffective. The trial court held an evidentiary hearing on Newton's post-verdict claims and issued findings of fact, conclusions of law, and an order denying Newton's motion.

¶22 Newton appealed, claiming among other things that (1) the State violated *Brady* when it did not turn Monica's phone over to the defense before or during trial and (2) Trial Counsel rendered ineffective assistance.[6] New Counsel continued to represent Newton through the appellate proceedings. The court of appeals rejected Newton's arguments and affirmed his conviction.[7] This court granted certiorari on a jury instruction issue and the *Brady* claim and affirmed on both grounds.[8]

*C. Postconviction Proceedings*

¶23 Newton then timely filed a petition for postconviction relief, alleging four main grounds: (1) his conviction violated due process because it was based on "erroneous, misleading, and unreliable expert testimony"; (2) the trial court violated his Sixth Amendment right to present a complete defense by reviewing Monica's cell phone data in camera rather than disclosing material exculpatory evidence to the defense; (3) he received constitutionally ineffective assistance before the trial court; and (4) New Counsel was ineffective on appeal. Newton later amended his petition to clarify that his allegations of ineffective assistance in the trial court encompassed both conduct by Trial Counsel and by New Counsel in posttrial proceedings.

¶24 As part of his petition, Newton highlighted four main pieces of evidence he had identified in a postconviction investigation. He argued the evidence would have been admitted at trial but for the ineffective assistance of counsel and other constitutional violations he alleged. First, he proffered a report from SANE Jeanlee Carver (SANE Carver) stating her expert opinion that SANE Turner's testimony suffered from many deficiencies. Second, he pointed to additional data from Monica's cell phone that the trial court had not disclosed after its in camera review. The cell phone data contained both text messages between Monica and three romantic partners on the evening of the assault and showed that text messages received late into the morning of

---

[6] *State v. Newton*, 2018 UT App. 194, ¶¶ 18–19, 437 P.3d 429.

[7] *Id.* ¶ 38.

[8] *State v. Newton*, 2020 UT 24, ¶ 1, 466 P.3d 135.

May 30 had been marked as "read." Third, Newton presented a report from Intermountain Forensics that more fully interpreted the DNA report introduced by the State at trial, noting that it indicated a second male DNA contributor not described at trial. Finally, he proffered a declaration and reenactment report created by a private investigator, which he claimed demonstrated Newton and Monica's encounter in Newton's small car could not have been non-consensual as described by Monica at trial.

¶25 The State responded to Newton's petition by filing a motion for summary judgment. Newton then filed a combined memorandum opposing the State's summary judgment motion and cross-moving for summary judgment. The State moved to strike Newton's cross-motion for summary judgment, arguing that by combining his memorandum opposing summary judgment with a cross-motion for summary judgment, Newton violated rules 7(n) and 65C of the Utah Rules of Civil Procedure and the PCRA.

¶26 After another hearing, the postconviction court granted the State's motion for summary judgment, as well as the motion to strike Newton's cross-motion for summary judgment. It concluded that Newton improperly combined his memorandum opposing the State's motion for summary judgment with his cross-motion for summary judgment in a single document, in violation of rule 7(n) of the Utah Rules of Civil Procedure.[9] The postconviction court also adopted the State's position that a petitioner could not obtain postconviction relief on a motion for summary judgment, but could only obtain relief after a hearing to prove its claims. It further noted that "its ruling granting summary judgment for [the State] would not have been different even if the court had not struck Newton's cross-motion for summary judgment and considered its merits."

¶27 On the State's summary judgment motion, the postconviction court concluded that Newton's claims based on due process and the right to present a complete defense were procedurally barred because they "could have been but [were] not raised in the trial court, at trial, or on appeal."[10] It also found that Newton's ineffective assistance claims based on Trial Counsel's performance were procedurally barred. It then rejected Newton's

---

[9] UTAH R. CIV. P. 7(n) ("A party may not make a motion in a memorandum opposing a motion. . . .").

[10] *See* UTAH CODE § 78B-9-106(1)(c).

ineffective assistance claims regarding New Counsel, concluding that Newton failed to show that any error committed by New Counsel in posttrial proceedings or on appeal resulted in prejudice. In other words, if "all the claims Newton says should have been raised before were raised, all the evidence Newton claims should have been presented was, all objections were made that Newton claims should have been, and all investigations were done as Newton says they should have been," the outcomes of the trial, the posttrial proceedings, and the appeals would not have been affected, and results would have returned the same.

¶28  Newton appealed and requested that this court retain the case rather than pour it over for consideration by the court of appeals. The State did not oppose retention, stating in its response letter: "The parties have a fundamental disagreement about Utah Rule of Civil Procedure 56's applicability in postconviction proceedings under Utah Rule of Civil Procedure 65C."

¶29  We review two issues on appeal: (1) whether the postconviction court erred in granting summary judgment for the State, and (2) whether the postconviction court erred in striking Newton's motion for summary judgment.

## STANDARD OF REVIEW

¶30  "We review a [postconviction] court's grant of summary judgment for correctness."[11] We also review a postconviction court's interpretation of the PCRA and our rules for correctness.[12]

¶31  Under the Utah Rules of Civil Procedure, a court must grant summary judgment "when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[13] "In making this assessment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party."[14]

---

[11] *Patterson v. State*, 2021 UT 52, ¶ 27, 504 P.3d 92.

[12] *See Thompson v. State*, 2024 UT 27, ¶ 24, 554 P.3d 988; *Simler v. Chilel*, 2016 UT 23, ¶ 9, 379 P.3d 1195 (reviewing rules).

[13] *Ross v. State*, 2012 UT 93, ¶ 18, 293 P.3d 345 (cleaned up), *abrogated on other grounds by McCloud v. State*, 2021 UT 51, 496 P.3d 179.

[14] *Id.* (cleaned up).

## ANALYSIS

### I. THE POSTCONVICTION COURT DID NOT ERR IN GRANTING SUMMARY JUDGMENT FOR THE STATE

¶32  Newton argues the postconviction court erred in granting summary judgment for the State and dismissing his PCRA petition. A petition for postconviction relief "is a collateral attack [on] a conviction and/or sentence and is not a substitute for direct appellate review."[15] To attack a criminal conviction after appeals have been exhausted, a petitioner may file a PCRA petition, which must state "in plain and concise terms, all of the facts that form the basis of the petitioner's claim to relief."[16] And the PCRA assigns the petitioner the "burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief" for most claims.[17] The petitioners also bear the burden of disproving any procedural bars to relief raised by the State.[18]

¶33  Under the PCRA, postconviction relief is not available on any ground that "was raised or . . . could have been but was not raised in the trial court, at trial, or on appeal."[19] But the PCRA provides an exception to this procedural bar in some circumstances, providing that a petitioner may obtain relief based on grounds that could have been raised but were not "if the failure to raise that ground was due to ineffective assistance of counsel."[20]

¶34  Ineffective assistance of counsel is both an exception to the PCRA's procedural bar and an independent constitutional claim. The Sixth Amendment to the United States Constitution guarantees criminal defendants "the right to the effective assistance

---

[15] *Carter v. Galetka*, 2001 UT 96, ¶ 6, 44 P.3d 626.

[16] UTAH R. CIV. P. 65C(d)(3).

[17] UTAH CODE § 78B-9-105(1)(a). We cite to the newest version of this statute because the updates since Newton filed his PCRA claim were not substantive.

[18] *Id.* § 78B-9-105(2).

[19] *Id.* § 78B-9-106(1)(b), (c).

[20] *Id.* § 78B-9-106(3)(a).

of counsel."[21] To demonstrate ineffective assistance of counsel, a petitioner must show that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense."[22] To prove deficient performance, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness."[23] And to prove prejudice, a petitioner must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[24] A reasonable probability that the result would have been different exists when petitioner's proof is "sufficient to undermine confidence in the outcome."[25] In making the prejudice determination, the court "must consider the totality of the evidence before the judge or jury."[26]

¶35 Because a petitioner must prove both prongs to establish a claim of ineffective assistance of counsel, a court may reject a petitioner's claim based on a failure to prove either prong.[27] "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."[28]

¶36 In addition to the right to effective assistance at trial, criminal defendants have "the right to the effective assistance of appellate counsel under the Due Process Clause of the Fourteenth Amendment to the United States Constitution."[29] And a PCRA petition presents the first opportunity for a petitioner to challenge

---

[21] *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (cleaned up); *see also* U.S. CONST. amend. VI; U.S. CONST. amend. XIV; UTAH CONST. art. I, § 12.

[22] *Strickland*, 466 U.S. at 687.

[23] *Id.* at 688.

[24] *Id.* at 694.

[25] *Id.*

[26] *Id.* at 695.

[27] *Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182.

[28] *Strickland*, 466 U.S. at 697.

[29] *Taylor v. State*, 2007 UT 12, ¶ 16, 156 P.3d 739.

a conviction based on the ineffectiveness of appellate counsel.[30] A claim of ineffective assistance of appellate counsel raised in a first PCRA petition is therefore never subject to the procedural bar for not having been raised previously.[31]

¶37 Ineffective assistance claims may also be layered—that is, appellate counsel can be ineffective for failing to raise an ineffectiveness claim about trial counsel. To overcome the procedural bar, a petitioner must show that appellate counsel's failure to raise a claim of ineffective assistance of trial counsel was objectively unreasonable and that there is a reasonable probability that the result of the appeal would have been different if the claim had been raised. Because there is no reasonable probability of a different outcome in the direct appeal if the claim of ineffective assistance of trial counsel would have failed, the prejudice prong of ineffective assistance of appellate counsel dovetails with the merits of the underlying ineffectiveness claim.

¶38 The prejudice analysis here requires showing there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different, with the relevant proceeding being the direct appeal. Consequently, the outcome of the appeal necessarily depends on the outcome of the prejudice analysis for the trial counsel's deficiencies, for the outcome of the direct appeal would only be different if trial counsel's actions resulted in prejudice. So the prejudice analysis for appellate counsel's ineffective assistance claim will closely resemble the analysis for the underlying ineffective assistance of trial counsel claim.

¶39 In his amended PCRA petition, Newton asserted four main grounds for postconviction relief. First, he asserted that the trial court violated his right to present a complete defense when it failed to disclose exculpatory cell phone data after its in camera review. Second, he argued that his conviction was obtained based on "erroneous, misleading, and unreliable expert testimony" by SANE Turner, in violation of his due process rights. Third, he argued that Trial Counsel was constitutionally ineffective based on repeated failures to investigate, prepare, admit evidence, and object to evidence at trial. Fourth, he claimed that New Counsel was

---

[30] *Id.*

[31] *See* UTAH CODE § 78B-9-106(1)(c), (3)(a).

constitutionally ineffective both in posttrial proceedings and on appeal.[32] He also argued that the cumulative effect of these errors warranted postconviction relief.

¶40 The postconviction court rejected each of Newton's claims and granted summary judgment to the State. The court held that Newton's first three claims were procedurally barred because they could have been raised previously. It then rejected on the merits Newton's ineffective assistance of counsel claims regarding New Counsel at the posttrial and appellate level, concluding that Newton failed to show that any deficient performance by New Counsel was prejudicial.

¶41 We will first address the claim for relief based on the failure to disclose exculpatory cell phone data, as this claim can be resolved under a procedural bar analysis. We conclude that this claim is procedurally barred because the claim could have been raised earlier and was not, and Newton does not allege that failure to raise it earlier was due to ineffective assistance of counsel. We will then address the other three claims together, for Newton bases them all on ineffective assistance of New Counsel. Those claims depend on trial-level ineffective assistance of counsel arguments, but appellate counsel cannot be ineffective for failing to raise issues that would not have succeeded on the merits below. Because we conclude that New Counsel could not have established prejudice based on the alleged errors of Trial Counsel, the appellate ineffective assistance claims also fail.

*A.     Ground 1: Cell Phone Data*

¶42 In his postconviction petition, Newton argued that the trial court violated his constitutional rights by failing to disclose exculpatory cell phone data. Newton raises this claim under the Sixth and Fourteenth Amendments to the United States

---

[32] In his petition for postconviction relief, Newton at times referred to the evidence he presented as "newly available evidence" that might satisfy the requirements for "newly discovered material evidence" under the PCRA. *See id.* § 78B-9-104(1)(e). But in his grounds for relief, he does not rely on the "newly available evidence" provisions in the PCRA, and on appeal he expressly disclaims any intent to rely on them. We address his claims as set forth in his petition, without analyzing the evidence under the newly discovered material evidence standard.

Constitution and article I, section 12 of the Utah Constitution. He argues that the failure of the court to disclose certain contents of Monica's cell phone in the posttrial proceedings, conducting only an in camera review, violated his rights to due process, to effective assistance of counsel, and to present a complete defense.

¶43 The State asserts that this claim is procedurally barred because it was raised or should have been raised in previous proceedings. The district court agreed, finding the claim procedurally barred and thus granting the State's motion for summary judgment. Newton disagrees, arguing that New Counsel moved to discover the cell phone data and raised ineffectiveness of Trial Counsel for failing to request access, but that the trial court denied New Counsel access to the full records. Given that New Counsel did not have the undisclosed cell phone records, Newton argues that his current claims could not have been brought before and therefore are not procedurally barred.

¶44 But the claim that Newton brings now was not dependent on having access to the undisclosed cell phone records. He raises the claim not as a *Brady* violation, alleging that the State inappropriately withheld evidence,[33] but as a claim that the trial court inappropriately withheld material evidence following its in camera review. At other times, he also seems to suggest that his counsel was ineffective for not seeking to obtain the data either from the State or through an independent investigation.

¶45 Under either formulation, the claim could have been brought on direct appeal. The district court's ruling releasing only limited portions of the cell phone records could have been appealed. And Trial Counsel's failure to take other steps to obtain the records could have been raised as an ineffective assistance of counsel claim. Neither claim was raised on direct appeal and, importantly, Newton has not argued that New Counsel was constitutionally ineffective for failing to do so. Because the claim "could have been but was not raised . . . on appeal,"[34] and Newton has not alleged that "the failure to raise that ground was due to

---

[33] *See Brady v. Maryland*, 373 U.S. 83 (1963).

[34] UTAH CODE § 78B-9-106(1)(c).

ineffective assistance of counsel,"[35] the claim is procedurally barred.

*B.    Grounds 2-4: Claims That Invoke Appellate Ineffective Assistance of Counsel*

¶46  We now turn to the remaining claims for relief.

1.    SANE Turner

¶47  Newton's first ineffective assistance claim asserts that his conviction rested on the "erroneous, misleading, and unreliable" testimony of SANE Turner, in violation of his due process rights under the United States Constitution and the Utah Constitution.[36] He challenges the validity of SANE Turner's testimony based on SANE Carver's report questioning her findings. SANE Carver reviewed the documents prepared by SANE Turner at the SANE examination, as well as relevant trial testimony and police reports in the case. Newton asserts that SANE Carver's report materially undermines the testimony of SANE Turner, which he describes as a pillar of the State's case. And he argues that his conviction based on that unreliable evidence violates his due process rights.[37] Although these claims were not adequately raised below, Newton asserts his Trial Counsel's ineffectiveness as an exception to preservation.

¶48  We first consider whether this ineffective assistance of counsel claim is subject to a procedural bar under the PCRA. The State asserted in its motion for summary judgment that this claim was barred because New Counsel raised the essence of the claim in the posttrial proceedings,[38] and that even if the claim was not raised before, it could have been raised in the trial court or on direct appeal. The district court agreed, finding this claim procedurally barred. Newton concedes that Trial Counsel or New Counsel could have investigated and obtained SANE Carver's report, and thus that the procedural bar applies. But he argues that the ineffective

---

[35] *Id.* § 78B-9-106(3)(a).

[36] *See* U.S. CONST. amends. V, XIV; UTAH CONST. art. I, § 7.

[37] *See State v. Ramsey*, 782 P.2d 480, 483 (Utah 1989) ("A conviction not based on substantial reliable evidence cannot stand. It is a violation of due process to convict and punish a man without evidence of his guilt." (cleaned up)).

[38] (Citing *Gardner v. Holden*, 888 P.2d 608, 615 (Utah 1994)).

assistance of counsel exception allows us to reach the merits of his claim.

¶49 Even if we take the State's position that this claim was raised in posttrial proceedings, we agree with Newton that a meritorious claim of ineffective assistance of appellate counsel would allow us to reach Newton's claim.[39] To overcome the procedural bar, Newton must show that New Counsel rendered ineffective assistance by failing to raise or adequately argue an issue on appeal. Newton argues that, because the underlying due process claim was ineffectively litigated below, New Counsel should have argued the issue on appeal under the ineffective assistance of trial counsel exception to preservation. We need not decide whether the failure to argue the due process issue through the lens of ineffective assistance of trial counsel constituted deficient performance by New Counsel, because we can resolve this case on the prejudice prong. We conclude that there is no reasonable probability that the result of the direct appeal would have been different because the claim that Trial Counsel was ineffective would have failed for want of prejudice.[40]

¶50 As related to the SANE testimony, Newton argues that Trial Counsel was deficient in primarily two respects. First, Trial Counsel failed to adequately object to what Newton asserts was unreliable testimony by SANE Turner. Second, Trial Counsel failed to adequately investigate and obtain an independent SANE evaluation, like the one Newton now presents from SANE Carver. Newton then argues that New Counsel was ineffective in posttrial motions and on appeal for not obtaining an expert report to show prejudice based on SANE Turner's testimony, failing to raise the constitutional due process dimension of the claim as he now asserts, and failing to adequately brief the ineffective assistance issue on appeal. Even assuming that New Counsel could have established that Trial Counsel performed deficiently in these respects, the result of the direct appeal would not have been

---

[39] Indeed, the State acknowledges that the PCRA does not bar "ineffective assistance of counsel claims that were raised previously but ineffectively litigated."

[40] *See Strickland*, 466 U.S. at 694; *State v. Gallegos*, 2020 UT 19, ¶¶ 62–64, 463 P.3d 641.

different because his ineffective assistance claims would have failed for lack of prejudice.

¶51 In assessing the merits of Newton's ineffective assistance of Trial Counsel claim, we are mindful of the summary judgment standard here, which operates in Newton's favor. A court may grant summary judgment only "when the record shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."[41] For the purposes of its summary judgment motion, the State does not dispute the substance of SANE Carver's report, but argues that it is nonetheless entitled to judgment as a matter of law. We similarly accept as true that SANE Carver's testimony, if admitted, would be consistent with her report.[42]

¶52 Newton makes six primary arguments about the validity of SANE Turner's testimony based on SANE Carver's report, asserting that: (1) SANE Turner's testimony about the impact of trauma on Monica's memory was not consistent with the evidence and scientific literature; (2) SANE Turner's testimony about blue dye uptake was not based on accurate scientific methods; (3) SANE Turner's testimony included several opinions not founded in scientific literature, as well as other prejudicial statements; (4) contrary to SANE Turner's conclusions, Monica's statements and actions were at times inconsistent or unexpected in the context of a violent sexual assault; (5) contrary to SANE Turner's conclusions, injuries that would be expected in such a violent rape were not present in the documentation of Monica's injuries; and

---

[41] *Ross v. State*, 2012 UT 93, ¶ 18, 293 P.3d 345 (cleaned up), *abrogated on other grounds by McCloud v. State*, 2021 UT 51, ¶¶ 43–61, 496 P.3d 179.

[42] Newton also argues that the postconviction court erred in making a credibility determination about SANE Carver at the summary judgment stage. We agree that any credibility determination was inappropriate because the court was required to "view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Ross*, 2012 UT 93 at ¶ 18 (cleaned up). But even taking as true that SANE Carver would have testified consistently with her allegations had she been called at trial or in a pretrial hearing about the admissibility of SANE Turner's testimony, we hold that Newton failed to show prejudice here.

(6) the injuries on Monica's neck were not consistent with SANE Turner's conclusion that Monica had been strangled.[43]

¶53 Before turning to SANE Carver's individual critiques, we note generally that she described SANE Turner's report as "both thorough and concise." She described SANE Turner's documentation as "provid[ing] considerable information." And SANE Carver's assessment of individual injuries based on the photographic evidence was largely consistent with SANE Turner's descriptions. In light of that overall agreement, and the other evidence at trial, we are not persuaded that any of Newton's attacks on SANE Turner's testimony, or any of his proffers of what would be new evidence at trial, would have made a difference at trial.[44]

¶54 Most of the individual disputes SANE Carver raises would have served only to impeach SANE Turner's testimony. And this court has noted that evidence offered solely "for impeachment (showing that a witness might not have been credible) is . . . *particularly unlikely* to change the result of the trial."[45] And unlike the proffered evidence in the cases Newton relies on, SANE Carver's evidence did not "affect the entire

---

[43] Though we rely on the undisputed facts in the record in our analysis, we need not assume that the parties' or the postconviction court's views on the law are correct. *See State v. Torres-Orellana*, 2024 UT 46, ¶¶ 43–46, 562 P.3d 706 (discussing this court's correctness review of legal questions embedded in other conclusions). Accordingly, we note that SANE Carver's report includes several statements beyond the scope of her expertise, such as commentary about whether non-consensual sex would have been possible in the confines of Newton's car and commentary about contradictions between the testimony of various witnesses. We do not consider these extraneous comments which may not have been admissible under rule 702 of the Utah Rules of Evidence. *See* UTAH R. EVID. 702(a) ("[A] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue.").

[44] *See Strickland*, 466 U.S. at 694.

[45] *Pinder v. State*, 2015 UT 56, ¶ 31, 367 P.3d 968.

evidentiary picture" here.[46] Rather, it presented a plausible alternative interpretation of largely the same evidence, but would not have meaningfully impacted the jury's assessment of Monica's testimony, the photographs of Monica's injuries, or the testimony of others corroborating Monica's version of events.

¶55  First, we consider the trauma evidence. At trial, SANE Turner testified briefly about the nature of trauma, stating that:

> "it's very common for our body to protect itself by just kind of going in[to] robotic mode and just no emotion . . . so that you can slowly, after the traumatic event has got some time between it, then your body will – your mind will let you start to remember certain little things that it thinks you can cope with."

¶56  After the State asked her about the impact of trauma on memory, she stated that research shows "the way that our body processes and remembers traumatic events, a lot of times the events will come back in pieces. They'll come back dream like." Halfway through her next sentence, Trial Counsel objected, arguing that this testimony was outside of her area of expertise, and the trial court sustained the objection. It also prevented the State from laying a

---

[46] *See Gregg v. State*, 2012 UT 32, ¶ 26, 279 P.3d 396 (cleaned up); *see also State v. Stefaniak*, 900 P.2d 1094, 1096 (Utah Ct. App. 1995) (explaining that once the defendant's proffered evidence undermined the victim's credibility, there was "not other evidence to support the defendant's conviction beyond that which [wa]s tainted by improper testimony" (cleaned up)). Newton cites to *Gregg* and to *Stefaniak* to argue that prejudice is more likely when the case turns on the credibility of the victim. And while we agree with Newton that Monica's testimony was central to the State's case here, we find his analogy to those cases unpersuasive. In both of those cases, there was no physical evidence or any corroborating witness testimony to bolster the victim's allegations. *Gregg*, 2012 UT 32, ¶¶ 26–30; *Stefaniak*, 900 P.2d at 1096. But here, even setting aside SANE Turner's testimony in full, Monica's testimony was bolstered by the photographic evidence of injuries and other witness testimony. And looking at the whole evidentiary picture, we find that SANE Carver's report would have been unlikely to affect the jury's verdict.

further foundation because the State had not provided notice that SANE Turner would testify on this issue.

¶57 In her report, SANE Carver gave a similar overview of trauma, noting that "[t]rauma does produce gaps in the memory during the body's production of stress hormones." She also noted that "[t]raumatic events do cause difficulty in sequencing. This may produce differing timelines of events and details outside of the perceived threats." But, she added, "during effects of true trauma, the details around the threats of harm and the specifics most important to survival, are not confused." She then challenged discrepancies in Monica's statements about the assault over time as being inconsistent with this understanding of trauma.

¶58 We begin by noting that we do not find in the record a full account of SANE Carver's qualifications, so it is unclear whether she was qualified to opine on the impact of trauma on memory.[47] But even assuming her qualifications, the two nurses' accounts were largely the same. Any alleged error in SANE Turner's testimony was quickly cut short by Trial Counsel's objection. And though SANE Carver challenges Monica's testimony as inconsistent on the details of the threats she faced, most of the alleged inconsistencies SANE Carver describes are primarily concerned with the order or sequence of events, consistent with SANE Carver's description of the impact of trauma. Newton thus fails to show any prejudice on this issue.

¶59 Second, we address the SANEs' respective statements about blue dye uptake. At trial, SANE Turner described applying a blue dye as part of Monica's SANE exam to show genital injuries not visible to the naked eye. Her testimony and her written report describe dye uptake in the "entire area around perihymenal/minora at 8 o'clock," indicating injuries in that area. Though SANE Carver generally agreed with the location of other genital injuries noted in SANE Turner's report, SANE Carver challenges SANE Turner's dye uptake analysis as scientifically unfounded, asserting that "[t]he medial surface of the labia minor is made up of mucous membrane, not epidermis or dermis" and therefore would show dye uptake regardless of injury.

¶60 Even assuming SANE Carver is correct on the science, we find that any error by SANE Turner was not prejudicial. In

---

[47] *See* UTAH R. EVID. 702(a).

describing her findings to the jury, SANE Turner qualified her dye uptake analysis, noting that part of the area identified was mucous membrane "so it uptakes dye regardless." But, she continued, part of the area "is epithelial tissue, which is the outer la[bia], so if it takes up dye then it means that the tissue integrity is (inaudible)." SANE Carver also noted in her report several other genital injuries "which are not described in SANE Turner's report." Taken together, we conclude that the jury had an overall accurate picture of the genital injuries, and any error was unlikely to have affected the verdict.

¶61  Third, we consider SANE Carver's assertions that SANE Turner stated several opinions and made prejudicial statements not consistent with the scientific literature or her role as a SANE. SANE Carver disputes SANE Turner's testimony at trial about the cause of Monica's injuries, the severity of those injuries, and whether the injuries were caused by consensual or non-consensual sex. She also challenges several statements as being generally prejudicial or merely a matter of personal opinion.

¶62 We disagree with SANE Carver's characterization of SANE Turner's testimony about the source of Monica's injuries. SANE Carver emphasizes that it is impossible to know when the bruises or genital injuries occurred, or if they were from Monica's encounter with Newton, and she faults SANE Turner for identifying the encounter as the cause of the injuries. At trial, consistent with her written report, SANE Turner noted that given the number of injuries, she did not write down how each injury was caused individually. Instead, she "just wrote the patient states unknown cause for all injury except where noted." SANE Turner reported that Monica only provided a cause for one bruise, which predated the assault, and then generally stated that "he was just really rough." Neither SANE Turner's trial testimony nor the report directly attributes the cause of each injury to the sexual encounter with Newton. And on cross-examination, SANE Turner agreed with Trial Counsel (and SANE Carver's report) that it is not possible to date bruises, which can develop as late as a week after an injury. SANE Carver's report adds little to the evidence already considered at trial, and we are not convinced it would have affected the jury's verdict.

¶63 The two SANEs also disagree about the severity of Monica's case. At trial, SANE Turner testified that Monica's injuries would be "painful" and that this case "involves a lot of violence,

especially a gun." She also testified that Monica had a lot of injuries and that she took more photographs in this case than in most ordinary SANE exams. In contrast, SANE Carver describes Monica's genital injuries as "minor." And she asserts that the "evidence does not support the 'violent' rape testified to by [Monica] and supported by [SANE] Turner[']s testimony."

¶64 At most, SANE Carver's report is capable of impeaching SANE Turner's assertions on the severity of the injuries. But the jury could see the photographs of the injuries, hear Monica's testimony of the assault, and compare that with SANE Turner's statements. So any separate testimony characterizing the injuries as "minor" was unlikely to have meaningfully changed the jury's judgment of the injuries. On cross-examination, Trial Counsel also challenged SANE Turner's assertions that the injuries would be painful by highlighting that SANE Turner's report denied that Monica was "complaining of pain or injury" when she started the SANE exam. Further, SANE Turner's statement that the encounter was violent was directly connected to the fact that there was a gun—something she knew only secondhand from Monica, not based on her assessment of the injuries themselves. And Trial Counsel emphasized in cross-examination that SANE Turner's position as a SANE necessarily required her to rely on many statements from her patient, of which she had no independent knowledge. Any alleged error here was unlikely to have affected the outcome of the trial.

¶65 SANE Carver also challenges SANE Turner's conclusions that Monica's "injuries [were] consistent with non-consensual intercourse." She argues those conclusions were merely personal opinion, not supported by scientific research, and that nothing about the injuries indicated they were either consensual or non-consensual. But we conclude that SANE Turner's statements were unlikely to have affected the jury. Notably, SANE Turner did not rule out that the injuries could be caused by consensual sex; she simply testified that they were consistent with non-consensual sex, a statement not at odds with SANE Carver's report. She also noted in her testimony that injuries are possible even during consensual sex. SANE Carver's testimony might have been helpful to the defense. But the jury heard Monica's testimony about the events of the evening, corroborated by some injuries to her feet and the testimony of others who saw her when she arrived at Helen's house, as well as other evidence about Monica's interactions with Newton that day. And SANE Turner's opinion that the injuries

could have been caused by non-consensual sex was unlikely to have affected the jury's verdict.[48]

¶66 Fourth, we consider Newton's contention that he was prejudiced because the jury never heard expert testimony that Monica's statements and actions were at times inconsistent with other cases of sexual assault. Specifically, SANE Carver argues that Monica's statement to SANE Turner that her mouth touched Newton's mouth is consistent with kissing, an act of affection which "is rarely seen in sexual assault." She also describes Monica's "report of getting into a vehicle with a strange man, after just being sexually assaulted in a car," as "surprisingly aberrant." While this testimony might have had minor impeachment value at trial, it was not likely to have affected the outcome given Trial Counsel's lengthy cross-examination of Monica to highlight inconsistencies in her story. That cross-examination even included asking Monica about her encounter with the man in the gas station, confirming that "like [Newton] he [was] a stranger to [Monica]" and yet, "like with Newton, [Monica] just g[o]t in the vehicle with him again."

¶67 Fifth, we evaluate Newton's argument that he was prejudiced because the jury never heard SANE Carver's testimony that Monica lacked injuries that might have been expected in the violent rape she described. SANE Carver described her surprise that Monica displayed no "road rash" injuries from jumping out of Newton's car, no additional injuries to her feet from walking barefoot for several miles, and no bruises to her inner thighs from having her legs forced open during the assault. This testimony was unlikely to have changed the jury's verdict because the jury was able to hear Monica's testimony and the corroborating testimony of others who described how "horrible" and disheveled she looked when she arrived at Helen's house. The jury also heard Newton's testimony of a very different encounter. The jury could see the photographs of Monica's injuries and consider based on common sense whether her injuries aligned with Monica's story or Newton's

---

[48] We similarly conclude that other opinion statements by SANE Turner, such as her description of what "usually" happens when a woman is hurting during consensual sex, were unlikely to have affected the outcome at trial. Even assuming that admission of those statements was error, a jury was unlikely to have given them great weight in light of the testimony at trial as a whole.

expert testimony. In this regard, it would have been unlikely to change the jury's perception of the evidence.

¶68 Finally, we consider whether Newton was prejudiced by SANE Turner's description of the strangulation evidence and the fact that SANE Carver's report was not admitted in that regard. SANE Turner testified to observing neck redness and petechiae "on the right of the trachea" that was "consistent with strangulation." Pictures of the injuries, showing redness in a line on the right side of her neck, were admitted at trial. SANE Turner also described that Monica had other symptoms consistent with strangulation, including neck pain, difficulty or pain when swallowing, loss of memory, and voice changes. SANE Carver takes issue with SANE Turner's descriptions, noting that the redness was on the side of Monica's neck, not the trachea, and the pattern of redness was not consistent with strangulation. Even taking as true SANE Carver's interpretations, they do not meaningfully undermine the evidence that Monica testified to being strangled, had injuries to her neck, and experienced other symptoms consistent with strangulation. We conclude that SANE Carver's report does not demonstrate prejudice in this regard.

¶69 In sum, Newton presents a new SANE report, arguing that his Trial Counsel was ineffective for not presenting a similar expert and for not objecting to SANE Turner's testimony at trial as inaccurate or unreliable. But his challenges, at best, only nip around the edges of SANE Turner's testimony and do not undermine the evidentiary picture at trial in significant ways.[49] Newton has failed to show a reasonable probability that this evidence would have changed the outcome of his trial.[50] Because he has failed to demonstrate prejudice, his claims for ineffective assistance at trial would have failed had they been raised on direct appeal.[51] Because he cannot show a reasonable probability that the result of the direct appeal would have been different, he has not established ineffective assistance of New Counsel necessary to overcome the

---

[49] *See Gallegos*, 2020 UT 19, ¶¶ 62–64; *Gregg*, 2012 UT 32, ¶ 26.

[50] *See Strickland*, 466 U.S. at 694.

[51] *See McCloud v. State*, 2021 UT 51, ¶ 83, 496 P.3d 176.

PCRA's procedural bar. We affirm the postconviction court's order dismissing this claim.[52]

### 2. Additional Ineffective Assistance Claims

¶70 The final two grounds for relief alleged in Newton's postconviction challenge assert that he received constitutionally ineffective assistance of counsel from Trial Counsel and from New Counsel in posttrial proceedings and on appeal. The district court granted the State's motion for summary judgment on these claims.

¶71 As we have seen, while ineffective assistance of counsel is an exception to a procedural bar under the PCRA, it is also an independent constitutional claim.[53] And though Newton concedes that his ineffective assistance of Trial Counsel claim is procedurally barred because it was raised earlier in posttrial proceedings and on appeal, he asks us to reach it based on his separate ineffective assistance of New Counsel claim.

¶72 "We need not evaluate [New Counsel]'s performance because any deficient performance could not have prejudiced" Newton.[54] New Counsel's failure to argue ineffective assistance of Trial Counsel on direct appeal cannot be prejudicial if such a claim would have failed on the merits. This is so because there is no reasonable probability that New Counsel's omission could have affected the outcome on appeal. Accordingly, as with the SANE claim, because we conclude that Trial Counsel was not ineffective, Newton's "fate would be no different had [New Counsel] raised on direct appeal the issues of which he now complains."[55]

¶73 Newton claims that Trial Counsel's performance was deficient in that he failed to do the following: adequately investigate and prepare for trial, obtain and present defense experts, investigate or present evidence undercutting Monica's testimony and credibility, investigate and develop rule 412 evidence, object to the State's allegedly inadequate expert notices or consult with the State's experts about their expected testimony, request a rule 702 hearing to exclude or limit SANE Turner's testimony or otherwise object to her expert testimony at trial, file

---

[52] *See* UTAH CODE § 78B-9-106(1)(b), (1)(c), (3)(a).

[53] *See supra* ¶ 34.

[54] *McCloud*, 2021 UT 51, ¶ 82, (cleaned up).

[55] *Id.*

motions to clarify for the jury the information about the discovery of Monica's cell phone, object to other trial testimony, and preserve arguments for appeal.

¶74  Newton identifies several ways that this alleged deficient performance by Trial Counsel prejudiced him. He argues that but for the deficient performance the evidentiary picture at trial would have been different. He asserts that Trial Counsel should have moved to admit the evidence in SANE Carver's report and objected to various statements by SANE Turner. He also argues Trial Counsel should have sought to discover and admit Monica's cell phone data. We have already determined that Newton has failed to prove prejudice based on any of this evidence.[56]

¶75  So we turn to examine whether the other changes in the evidence he alleges would have affected the jury's verdict at trial. Those evidentiary changes include: (1) a DNA report and other evidence related to the presence of a third individual's DNA, (2) a reenactment report, (3) impeachment of Monica as a witness, (4) a stipulation about the placement of Monica's cell phone near Newton's home, (5) exclusion of several statements by the investigating detective, and (6) exclusion of prejudicial questioning about how difficult the SANE exam must have been.

¶76  First, we consider the Intermountain Forensics DNA report that Newton argues should have been admitted. In addition to listing Newton as a contributor to DNA swabs collected from Monica, the report notes the presence of DNA from a third individual. Newton argues that Trial Counsel should have admitted the report and questioned Monica about her sexual activity with another man a few days before the assault to establish that someone else could have been the source of Monica's injuries. He also argues this evidence would impeach Monica for lying to SANE Turner that she had not had sex within the last several days before the assault.

¶77  But even assuming the evidence was admissible,[57] this evidence would not have affected the outcome of the trial.[58] As the postconviction court pointed out, the DNA report did not provide

---

[56] *See supra* ¶¶ 44–70.

[57] *Cf.* UTAH R. EVID. 412.

[58] *See Strickland*, 466 U.S. at 694.

any new information beyond that contained in the trial record, as the report was produced merely based on a review of the laboratory reports admitted at trial. Still, the report added a plain-language translation of the presence of a third contributor in the DNA evidence that was not originally explained. But in light of the other evidence at trial, the fact that Monica had sex with someone else a few days prior, and even the fact that she failed to report that encounter to SANE Turner at her exam, would not have affected the jury's verdict.

¶78 While Newton argues that Monica could have sustained her various injuries in the previous sexual encounter rather than from Newton, the jury was particularly unlikely to extrapolate that conclusion from this small piece of evidence, in light of Monica's extensive testimony about Newton's conduct, which was corroborated by SANE Turner's testimony, testimony of others who encountered Monica shortly after she arrived at Helen's house, and evidence that a bystander reported seeing someone walking barefoot down Bangerter Highway at the time Monica reported she was making her way home. The DNA evidence had at most minimal impeachment value but was unlikely to have changed the outcome.[59]

¶79 Second, we consider the reenactment report. After trial, investigators reenacted Monica's encounter with Newton in a comparable vehicle, with actors of similar size to Newton and Monica. The investigators found that it was difficult to perform certain actions described by Monica in the tight confines, causing Newton to argue that "it was likely physically impossible for a violent rape to have taken place in the small confines of the vehicle as Monica described." Newton also challenges that it would have been difficult for him to retrieve his gun as described.

¶80 But the reenactment report is not reasonably likely to have changed the outcome of this case. No one disputes that Monica and Newton had sex in the car. Newton asserts only that the evidence shows it was consensual. Monica's testimony supports a reasonable inference that Newton compelled her cooperation by fear as much as by force, such that any act they could have performed consensually was also possibly non-consensual. And in the face of agreement by all parties that the

---

[59] *See Gallegos*, 2020 UT 19, ¶¶ 62–64; *Pinder*, 2015 UT 56, ¶ 31.

encounter in fact occurred, the reenactment report would have added little to the jury's analysis.

¶81 Third, Newton argues that he was prejudiced by Trial Counsel's failure to impeach Monica's testimony in several ways — by highlighting her false statement to SANE Turner that she had not engaged in sex in the days before the assault, introducing testimony from witnesses that they did not believe Monica's rape allegations, and introducing witness testimony that Monica had previously made rape allegations. We first note that Trial Counsel raised several inconsistencies in Monica's accounts during cross-examination for impeachment purposes. And Newton has not met his burden to show that the other presumptively inadmissible evidence about Monica's prior sexual activity would be admissible.

¶82 Newton argues this evidence would be admissible under rule 404 as evidence of modus operandi, under rule 608 as evidence of Monica's character for untruthfulness, and under an exception to the rape shield rule in rule 412.[60] But modus operandi evidence is used to infer identity, and Monica's identity is certainly not in dispute, leaving Newton's vague claims that Monica had a history of "getting drunk, engaging in sexual activities with others, and then claiming to have been sexually assaulted" as merely inadmissible character evidence under rule 404.[61] Similarly, without showing that any of Monica's past rape claims were false, the facts that she made the claims or that others disbelieved them are not enough to demonstrate falsity such that the evidence would be admissible as probative of her character for untruthfulness under rule 608.[62] Further, Newton has not made a showing that any

---

[60] *See* Utah R. Evid. 404(b); *id.* R. 608; *id.* R. 412(b).

[61] *See id.* R. 404(b) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character" but "may be admissible for another purpose, such as proving motive . . . [or] identity."); *State v. Lucero*, 2014 UT 15, ¶ 15, 328 P.3d 841, *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016.

[62] *See* Utah R. Evid. 608(a) ("A witness's credibility may be attacked . . . by testimony about the witness's reputation for having a character for . . . untruthfulness . . . ."); *id.* R. 608(b)(1) ("[E]xtrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for

of this evidence would be necessary to ensure his constitutional rights under rule 412(b)(3).[63] We conclude that Newton has failed to show that this evidence is admissible and thus has failed to prove that its exclusion prejudiced him.

¶83 Fourth, Newton contends he was prejudiced because Trial Counsel did not obtain a stipulation or instruction clarifying that Newton could not have placed his cell phone outside his home in the time frame when it appeared. He argues that the jury heard incomplete information that the cell phone was found outside of his house more than a year after the assault in this case, giving rise to an inference that he had taken Monica's cell phone and hidden it there. But, he argues, because he was incarcerated in the lead-up to trial—evidence not revealed to the jury—and the cell phone did not appear as if it had been outside for long, he was entitled to an instruction that he did not place it there. We are not convinced based on the evidence that Newton was entitled to such an instruction. Witness testimony was inconsistent about the condition of the phone, such that it was for the jury to decide how long the phone had been left outside, and the cell phone's discovery was such a minor issue at trial that any such stipulation was unlikely to have changed the outcome at trial.

¶84 Fifth, we address Newton's argument that effective counsel would have objected to and sought to exclude several statements by the investigating detective at trial. He challenges the detective's testimony that Monica "was very straightforward and honest" when he interviewed her and that changes in the details of a victim's story between interviews did not indicate dishonesty but

---

truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of . . . the witness . . . .").

[63] *See id.* R. 412(a), (b)(3) (providing that while evidence of a victim's other sexual behavior is generally inadmissible in a criminal case about alleged sexual misconduct, such evidence is admissible if excluding it would violate the defendant's constitutional rights and the evidence is otherwise admissible); *see also State v. Rallison*, 2023 UT App 34, ¶ 18, 528 P.3d 1235 (noting that exception to rule 412 only applies "where exclusion of the evidence forecloses any meaningful avenue for presenting a defendant's fundamental defense to charges against him" (cleaned up)).

might suggest trauma. Even assuming admission of these statements was error, the jury could independently evaluate Monica's credibility based on her statements at trial and the corroborating evidence provided by Helen and the officers. It could also consider the inconsistencies in her statements highlighted by Trial Counsel on cross-examination and consider Newton's competing version of events. In light of this other evidence, it is unlikely that the detective's statements made any difference to the verdict.

¶85 Newton also challenges the detective's testimony characterizing Newton's safe as "quick access," suggesting it would have been easy for Newton to open while engaged in intercourse with Monica. But Newton's arguments mischaracterize the evidence that was before the jury. The jury had access to photographs of the safe, in addition to the officer's testimony that the safe was accessible by entering a combination into a lock. Taking the evidence as a whole, the officer's statement that the safe was "quick access" could not have affected the jury's verdict.

¶86 Finally, we consider Newton's claim that he was prejudiced because Trial Counsel did not object to prejudicial questioning of Monica about how difficult the SANE exam must have been. In light of her other statements alleging a violent rape, any unfair sympathy these statements engendered for Monica had no reasonable probability of affecting the jury's verdict.

¶87 We conclude that Newton has not demonstrated a reasonable probability that the outcome of the trial would have been different but for Trial Counsel's alleged errors. Because he has failed to demonstrate prejudice on those claims, there is no reasonable probability that, but for New Counsel's failure to raise those claims on direct appeal, "the result of the proceeding would have been different."[64] So we affirm the district court's decision granting summary judgment for the State and dismissing.

C. *Cumulative Prejudice Claim*

¶88 Newton also claims prejudice arising from all his alleged errors combine to undermine our confidence in the jury verdict at trial.[65] As above, he raises this as an ineffective assistance of

_____

[64]*Strickland*, 466 U.S. at 694.

[65] *See State v. Martinez-Castellanos*, 2018 UT 46, ¶¶ 39–42, 428 P.3d 1038 (holding that a court may reverse a verdict based on

appellate counsel claim, based on New Counsel's failure to argue that Trial Counsel was ineffective for not addressing the alleged cumulative errors. For reasons similar to those we have already discussed, we also reject this claim.

¶89 The jury at trial heard Monica's testimony describing a forcible rape. The jury also heard Newton's version of events, laying out a consensual encounter between two new acquaintances. The jury saw photographs of Monica's injuries and heard testimony that after the encounter occurred, her dress was inside out, she looked disheveled, and she had multiple injuries. The jury also heard extensive testimony from SANE Turner who documented the injuries, much of which remains unchallenged by Newton's claims.

¶90 Newton's new claims do little to challenge this evidentiary picture. He raises new evidence to impeach Monica's credibility, but many of his attacks are similar to or overlapping with cross-examination questions already raised by Trial Counsel. SANE Carver's expert report agrees with most of SANE Turner's descriptions, though it challenges the scientific basis of a few descriptions and reaches different ultimate conclusions about whether the encounter was consensual. The jury was already alerted to some of the limitations of SANE Turner's testimony by cross-examination. And SANE Carver's assertions would not have meaningfully altered the evidence of physical injuries the jury had already heard. The DNA report Newton proffers was at best cumulative, and the reenactment report did little to contradict Monica's testimony that she was coerced into non-consensual sex by a mixture of force and threats. None of his other challenges, together or alone, would have meaningfully affected the evidentiary picture as a whole or materially undermined the State's evidence.[66] Newton's challenges do not undermine our confidence in the jury verdict, and we reject his cumulative error challenge.[67]

---

multiple harmful errors only if "the cumulative effect of all the potentially harmful errors undermines [the court's] confidence in the outcome").

[66] *See Gregg*, 2012 UT 32, ¶ 26; *Stefaniak*, 900 P.2d at 1096.

[67] *See Martinez-Castellanos*, 2018 UT 46, ¶ 42.

¶91   Having rejected each of Newton's claims in turn, we find no error in the district court's decision to grant the State's motion for summary judgment and dismiss Newton's PCRA petition.

II. THE POSTCONVICTION COURT DID NOT ERR IN STRIKING NEWTON'S MOTION FOR SUMMARY JUDGMENT AS IMPERMISSIBLE WHEN COMBINED WITH A RESPONSE TO THE STATE'S MOTION

¶92 We now consider the parties' arguments concerning Newton's own summary judgment motion. After the State filed its motion for summary judgment in response to Newton's petition for postconviction relief, Newton filed a combined document that opposed the State's motion and cross-moved for summary judgment, asking the postconviction court to grant Newton's petition and vacate his convictions via summary judgment. The State moved to strike Newton's cross-motion for summary judgment. After a hearing, the postconviction court granted the State's motion to strike and denied Newton's postconviction petition. The postconviction court found it improper for Newton to combine his opposition memorandum with a cross-motion. We agree.

¶93 Rule 65C of the Utah Rules of Civil Procedure and the PCRA govern postconviction proceedings. The PCRA explicitly states that the Utah Rules of Civil Procedure apply in postconviction proceedings.[68] We read that to mean that so long as they are consistent with rule 65C, the civil rules fill in the gaps.[69] Rule 7(n) of the Utah Rules of Civil Procedure states, "A party may not make a motion in a memorandum opposing a motion or in a reply memorandum." Rule 65C(k) instructs that if a respondent files a motion for summary judgment, "the petitioner may respond by memorandum to the motion," and that "[n]o further pleadings or amendments will be permitted unless ordered by the court."[70] But rule 65C does not address whether a party may make a motion in a response memorandum. Rule 7(n) provides that guidance and is not inconsistent with rule 65C. Thus, we read rule 7(n) as governing response memorandum form.

---

[68] UTAH CODE § 78B-9-102(1)(a) ("Proceedings under [the PCRA] are civil and are governed by the rules of civil procedure.").

[69] *See Noor v. State*, 2019 UT 3, ¶ 26, 435 P.3d 221.

[70] UTAH R. CIV. P. 65C(k).

¶94  Under rule 7(n), we conclude that a PCRA petitioner may not make a motion in an opposition memorandum. Newton's response to the State's motion for summary judgment was an improper vehicle for his cross-motion, and the postconviction court properly struck the cross-motion.

¶95  While we could resolve this issue on that procedural basis alone, we opt to go further to answer the question of whether, as a general matter, a postconviction petitioner can file a motion for summary judgment. Ordinarily, we are disinclined to reach an issue not crucial to a case's resolution, but we have the discretion to offer guidance on non-jurisdictional questions.[71] And the parties both requested that this court retain jurisdiction to address the parties' "fundamental disagreement about Utah Rule of Civil Procedure 56's applicability in postconviction proceedings under Utah Rule of Civil Procedure 65C." The State highlighted in its response to Newton's retention letter that "this case presents a novel question that will affect ongoing and future cases that the Court will have to consider eventually."

¶96 We have made clear that Newton's cross-motion for summary judgment was procedurally inappropriate within a response brief, but whether he, as a postconviction petitioner, may bring a motion for summary judgment at all is an important question that we choose to answer for the benefit of the bar.

### III. THE UTAH RULES OF CIVIL PROCEDURE AND THE PCRA ALLOW PCRA PETITIONERS TO FILE MOTIONS FOR SUMMARY JUDGMENT

¶97 Beyond its ruling that Newton's cross-motion for summary judgment was procedurally inappropriate under rule 7(n), the postconviction court also found that Newton's motion for summary judgment was improper. But nothing in rule 65C precludes a petitioner from filing a summary judgment motion. Subsection (k) of rule 65C lays out the procedures for a respondent to "answer or otherwise respond" to a postconviction petition, and for a petitioner to respond to a respondent's answer or response.[72] After a petitioner files for postconviction relief, the postconviction court reviews the petition, and it can summarily dismiss any claim that "has been adjudicated in a prior proceeding" or "any claim in

---

[71] *Utah Transit Auth. v. Loc. 382 of the Amalgamated Transit Union*, 2012 UT 75, ¶ 24 & n.14, 289 P.3d 582.

[72] UTAH R. CIV. P. 65C(k).

the petition [that] appears frivolous on its face."[73] In response to any claims that remain, the State must "answer or otherwise respond to the portions of the petition that have not been dismissed" within thirty days.[74] Then the rule mentions summary judgment for the first and only time, noting that the petitioner may respond by memorandum within thirty days "after service of any motion to dismiss or for summary judgment."[75]

¶98 After a petitioner has an opportunity to respond to the State's answer or response, rule 65C(k) states that "[n]o further pleadings or amendments will be permitted unless ordered by the court."[76] Rule 7 of the Utah Rules of Civil Procedure defines pleadings allowed in a civil case as "(1) a complaint; (2) an answer to a complaint; (3) an answer to a counterclaim designated as a counterclaim; (4) an answer to a crossclaim; (5) a third-party complaint; (6) an answer to a third-party complaint; and (7) a reply to an answer if ordered by the court."[77] So a motion for summary judgment is not a pleading.

¶99 Rule 65C(k) limits parties in postconviction proceedings from filing additional "pleadings or amendments" beyond what is allowed under that rule, but it says nothing about motions. Under the PCRA's own instruction, we apply the Utah Rules of Civil Procedure so long as those rules are not inconsistent with any of the PCRA's mandates or rule 65C.[78] Because rule 65C does not "explicitly address" whether a postconviction petitioner may file a motion for summary judgment, we look to the other rules of civil procedure.[79] Subsection (b) of rule 7 explains the procedures for filing a motion and instructs parties filing a motion for summary judgment that they "must follow the procedures of this rule as

---

[73] *Id.* R. 65C(h)(1).

[74] *Id.* R. 65C(k).

[75] *Id.*

[76] *Id.* (cleaned up).

[77] *Id.* R. 7(a).

[78] UTAH CODE § 78B-9-102(1)(a); *Noor v. State*, 2019 UT 3, ¶ 26, 435 P.3d 221.

[79] *Noor*, 2019 UT 3, ¶ 26.

supplemented by the requirements of Rule 56."[80] Again, no provision precludes a postconviction petitioner from filing a motion for summary judgment. We conclude that, under the Utah Rules of Civil Procedure, any party may file a motion for summary judgment in a postconviction proceeding in accordance with the requirements of rule 56.[81]

¶100   We briefly address the State's concerns about accepting a petitioner's version of facts as true for summary judgment purposes. The State worries that if it accepts as true petitioner's version of the facts for purposes of the State's summary judgment motion, it is therefore bound to those facts in opposing the petitioner's summary judgment motion. But the State misunderstands the summary judgment process. The motion for summary judgment functions at the postconviction stage just as it does in the civil context, where cross-motions for summary judgment are more common. "The determination of which party must come forward with evidence proving that there is a genuine material dispute of fact depends on which party bears the burden of proof on the underlying legal theory or claim that is the subject of the summary judgment motion."[82] "In the context of cross-motions for summary judgment, we examine each motion separately, viewing the facts and reasonable inferences drawn therefrom in the light most favorable to the non-moving party."[83] Under these standards, to defeat a petitioner's motion and proceed to an evidentiary hearing, the State need only show a dispute over a material fact, with the facts and inferences viewed in the State's

---

[80] UTAH R. CIV. P. R. 7(b)(5).

[81] We note that we have previously addressed petitioner-filed motions in postconviction settings, including motions for summary judgment. *See, e.g.*, *Menzies v. State*, 2014 UT 40, ¶¶ 67–70, 344 P.3d 581, *abrogated on other grounds by McCloud v. State*, 2021 UT 51, 496 P.3d 179 (addressing the merits of a postconviction petitioner's motion for summary judgment, motion seeking an evidentiary hearing, a rule 56(f) extension, and to supplement the record, implicitly finding all were appropriate filings under the PCRA).

[82] *Jones & Trevor Mktg., Inc. v. Lowry*, 2012 UT 39, ¶ 30, 284 P.3d 630.

[83] *Prince, Yeates & Geldzahler v. Young*, 2004 UT 26, ¶ 10, 94 P.3d 179.

favor. And the State is not bound to facts it chose not to dispute for purposes of its own summary judgment motion.[84]

¶101   We also consider the State's assertion that Newton's motion for summary judgment was impermissible because it "preclude[d] the court from holding an evidentiary hearing or taking evidence." In support, the State points to the postconviction court's conclusion that under rule 65C, courts can only grant relief for the petitioner after holding an evidentiary hearing so they can enter findings of fact and conclusions of law.[85] But this, too, mischaracterizes the legal standards that govern summary judgment.

¶102   Under rule 65C(o)(1), "If the court vacates the original conviction or sentence, it shall enter findings of fact and conclusions of law and an appropriate order."[86] Though we agree that formal findings are necessary to grant a petition for relief, we disagree that an evidentiary hearing will always be required. Under rule 56, to support its claim that there are no genuine issues of material fact, a moving party must cite to evidence.[87] In the postconviction context, that includes facts already found in the trial record.[88] And in some cases, the State will stipulate to facts not in the trial record. If the record shows no genuine dispute as to the material facts necessary to grant relief, we see no reason for the postconviction court to independently refind the facts in an evidentiary hearing. Rather, the court may enter findings of fact

---

[84] *See Zundel v. Magana*, 2015 UT App 69, ¶ 13, 347 P.3d 444 ("Summary judgment cross-motions may be viewed as involving a contention by each movant that no genuine issue of fact exists under the theory it advances, but not as a concession that no dispute remains under the theory advanced by its adversary. In effect, each cross-movant implicitly contends that it is entitled to judgment as a matter of law, but that if the court determines otherwise, factual disputes exist which preclude judgment as a matter of law in favor of the other side." (cleaned up)).

[85] *See* UTAH R. CIV. P. 65C(o)(1).

[86] *Id.*

[87] *Id.* R. 56(c)(1).

[88] *See id.* R. 65C(n)(3).

and conclusions of law and grant relief based on the undisputed material facts of the case.

¶103   Ultimately, to succeed on a summary judgment motion at the postconviction stage, petitioners face a very high bar. A petitioner must prove "that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law," just as they would outside the postconviction context.[89] It may be rare for a postconviction court to grant a petitioner's motion for summary judgment. But the improbability of a petitioner successfully proving no genuine dispute of fact does not dispossess him of his procedural right to try.

## CONCLUSION

¶104   We affirm the postconviction court's ruling, as we see no error in the court's decision to grant the State's motion for summary judgment, nor any error in its decision to strike Newton's responsive motion for summary judgment as improperly filed. But we clarify that the Utah Rules of Civil Procedure and the PCRA do not prohibit postconviction petitioners from filing freestanding motions for summary judgment.

---

[89] *Id.* R. 56(a).